859 A.2d 756

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DAVID CORDOMA, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 5, 2004—Decided November 3, 2004.

526

Before Judges KESTIN, FUENTES and FALCONE.

*Patrick M. Durning,* attorney for appellant.

*John Kaye,* Monmouth County Prosecutor, attorney for respondent (*Kathleen Bycsek,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

Defendant, David Cordoma, is a former State Corrections Officer who retired after the State Division of Pensions and Benefits found him to be permanently and completely disabled. Defendant appeals from the judgment of the Family Part ordering the forfeiture of his service handgun, ammunition, other gun paraphernalia, and firearm identification card. The seizure order was issued as part of a domestic violence temporary restraining order (TRO) obtained by his former wife. She voluntarily withdrew the TRO before any final restraining order was issued.

Based on the record before us, we conclude that there was insufficient evidence to support the trial court's finding that defendant was unfit to possess a firearm. We hold, however, that the evidence presented by the State provided a rational basis,

pursuant to *N.J.S.A.* 2C:58-3c, to question defendant's suitability to possess a firearm. Under the doctrine of implied waiver, defendant's right to confidentiality in the medical information kept on file by the Division of Pensions and Benefits is subordinate to the State's interest in preventing the possession of firearms by individuals deemed statutorily disqualified.

## I

The parties are former husband and wife. They were married for approximately eight years and had three children who were ten, eight and five years old at the time this matter came before the trial court.

The incident that gave rise to the issuance of the TRO against defendant occurred on June 6, 2002. The record does not contain a copy of the domestic violence complaint filed by his former wife, but she gave the following description of the incident in the course of her testimony at the forfeiture hearing:

> I was leaving my house in Freehold, and I was driving to the woman's house who used to provide day care for me, to make a final payment to her. And I was driving down Route 9 and I noticed in my rear view mirror, a car driving fairly close to me. And I thought it was just somebody that wanted to pass me.
>
> So I went, I was in the fast lane, went to the slow lane. The car went behind me and I proceeded to drive down. And then I got into Lakewood on West County Line Road, and I was stopped at a traffic light, and I looked in my rear view mirror and I noticed that this car was behind me at this traffic light.
>
> And I kind of got a little taken aback by it, because it was from Freehold to Lakewood. So, I made the left onto Hope Chapel Road and I pulled over on the side of the road, and the car went past me.
>
> So, I proceeded to go to this house where I was going to make the payment. And I walked in the house and there was a couple people in there, and I had just explained that I believed that I was being followed. And they said, what do you mean—
>
> \* \* \* \* \* \* \* \*
>
> And I proceeded to make the payment. And they went outside for whatever reason, and came back in. They said that there's a car that you described sitting out in front of the house. And there was a man in the car taking pictures of your car and the house. And I went to go outside and at that point the car was gone. So then I called the Lakewood Police to come.
>
> THE COURT: So you never realized who was in the car?

THE WITNESS: Absolutely not. Uh hum. I didn't know.

She also testified that, in the course of their marriage, defendant was occasionally "verbally abusive," a term she defined as "yelling, being aggravated at stuff, blaming me for problems with bills." There was also one incident of physical abuse that occurred on Christmas Eve in 1998. According to the former Mrs. Cordoma, defendant physically threw her down onto the ground, causing her to strike her head against sheetrock that had been placed there. Although she did not receive medical attention, she had scratches and a bump on her head. She did not summon the police nor seek judicial relief in the form of a domestic violence TRO. The couple separated in November 1999.

The ex parte TRO issued in connection with the forfeiture proceedings contained the standard provision, pursuant to *N.J.S.A.* 2C:25–29b, barring defendant from possessing any firearm. The police officer who served the TRO described defendant's demeanor at the time of service as "relaxed." The officer permitted defendant to leave the room to retrieve the handgun that he kept unloaded and locked in a secure container. The officer also confiscated twenty rounds of .40 caliber ammunition.

It is undisputed that defendant possessed this weapon incident to his former position as a State Corrections Officer. It is equally undisputed that defendant never threatened his former wife with the gun or otherwise used the weapon in an inappropriate manner against her or anyone else. The TRO remained in effect from June 7, 2002, until July 26, 2002, when the former Mrs. Cordoma voluntarily moved before the Family Part to dismiss the complaint and vacate the restraints.

On October 9, 2003, the State instituted forfeiture proceedings before the Family Part pursuant to *N.J.S.A.* 2C:25–21d(3). As part of the testimony received concerning defendant's fitness to possess a firearm, the court heard the following from defendant's former wife:

Q. Are you aware if [defendant] has any kind of physical disability?

A. I know that, it was after we were separated, but I know that he's retired from his job as a corrections officer for a disability. I know that he has a disability retirement.

Q. . . . How do you know that?

A. Because at one point when we were at both of our respective attorney . . . for a four-way conference on the day of our divorce, we were sitting in the lobby and just speaking. And I asked him did, you know, just basically what happened with your disability? Why aren't you working?

And he told me that he didn't really want to talk about it, and *it wasn't that much of a physical thing, it was more of a mental disability*. And I said, what do you mean? And he said, I just don't want to talk about it.

But I know that, because at that point he was seeing my children, and I know that he wasn't in a hospital or anything like that. So, and that's the most that I know . . . (Emphasis added.)

The State also called Peter Gorman, a representative of the State's Division of Pensions and Benefits, to establish a foundation for admitting defendant's retirement file. According to Gorman, defendant obtained an "ordinary disability" retirement benefit. This meant that the nature of the disability was not caused by a work-related accident.[1] When the State attempted to introduce into evidence the medical documentation submitted by defendant in support of his application for "ordinary disability" benefits, defendant objected based on the patient/physician privilege. Thereafter, the following colloquy between the court and defense counsel ensued:

THE COURT: And well, what is the basis of the objection?

DEFENSE COUNSEL: Well, doctor/patient privilege. I am not releasing those records for this hearing. My client is not releasing those records for this hearing.

THE COURT: Well, here's the thing. In order to make a determination as to whether the weapons should be forfeited and his authority to carry weapons should be revoked, *N.J.S.A.* 2C:58-3 suggests that I have to make a finding as to whether the person has—And I have no idea what the disability was or what the medical situation was. But he has to be . . . physically capable, not suffer from a physical defect or disease. And that he's not somebody who would be considered . . . unsafe to carry firearms.

And also as to whether he suffers from a mental disorder, and whether he was confined for that disorder. So, I think it's completely relevant to my determination

[1] See *N.J.S.A.* 43:7–12, distinguishing between an "ordinary disability" and an "accidental disability," by defining the latter to be caused by "a traumatic event occurring during the performance of duty."

as to whether this person should receive his weapon back and whether he should be authorized to carry a permit, license or other authorization to use or own a firearm.

DEFENSE COUNSEL: I certainly don't disagree. It's probably very relevant. But it's also privileged and I'm not waiving it for my client, and my client is not waiving it. I think the burden is upon the State to prove that my client is unfit in some fashion. Because we heard no testimony from the wife saying he's physically or mentally unfit in any fashion.

THE COURT: Well, you have to understand, the burden here is a simple preponderance of the evidence. Is it more likely than not. So, without—If you want to not have them come in, and the only thing I heard about was the wife saying that he had a mental disability, then I'll leave that to you. I don't know what those records say. I have absolutely no idea. And if you don't want me to consider them, I won't consider them. But I don't know if that's better or worse. But if you—

DEFENSE COUNSEL: Well, but since—Judge, I think the reason why I'm fighting so hard is that first he was never confined for a mental disorder. There's nothing before Your Honor reflecting that my client was confined in any fashion.

THE COURT: There's nothing that says he wasn't either.

The court ultimately denied the State's application to introduce the medical information contained in defendant's retirement file. Construing the provisions of *N.J.R.E.* 506, the court concluded that defendant had a reasonable expectation that the medical information provided to the Division of Pensions and Benefits would be used exclusively to support his application for benefits, and would not be disclosed to any third party for any other purpose.

Thus, the only evidence before the court as to defendant's fitness to possess a firearm came from the testimony of his former wife. Defendant allegedly told her that his disability pension was based more on his "mental" rather than his physical condition. After reviewing the applicable statutory provisions, the court granted the State's forfeiture application. The court explained its ruling as follows:

Now here, I have absolutely no real information about the medical disability. I'm going to assume, based upon just the testimony that was provided to the Court, but which I had no, I have no basis to believe or disbelieve. But again, the burden here is a preponderance of the evidence. And I hear about a medical disability, there are records that I have not been able to consider. But I've received no testimony other than that the defendant here had a mental disability and received, as Mr. Gorman testified, total and permanent disability as a New Jersey corrections officer.

I have no testimony from this defendant to say what it was that was the problem, or what it is that he might have done to correct the problem. And therefore, I cannot say that he does not pose a threat to the public health and safety. And I cannot say that he is fit to carry a firearm or is fit to be authorized, permitted or licensed to carry a firearm.

And therefore, based upon that and based upon, again, the burden. I believe State has met their burden of proving by a preponderance of the evidence that the weapons or weapon here should be seized.

* * * * * * * *

... But again, I have no idea. And even if it wasn't a mental disability, let me say this. *Whatever the disability was, I have no idea if that would prohibit him from being able to possess a firearm.* The only testimony I had here was from the wife, who said it was a mental disability. And then again, you know, I have nothing to contradict that. So, I have to say, as I indicated, up until the point where the records were an issue, I did not believe that the State had proved to me that there was an issue of concern.

Again, that was based upon my reading of the underlying domestic violence complaint. It was one where he supposedly followed her and took some photographs. But I did not hear anything from him with regard to that situation or their subsequent relationship, or whatever disability might have caused him to seek a full and complete disability.

DEFENSE COUNSEL: But Judge, in your ruling if you're going to conclude, if you did, you did conclude that it was a mental disability, the statute requires that there be proof of confinement. There's no proof of confinement before Your Honor in any fashion.

THE COURT: All I need to find—I don't have to find on a medical disability. All I have to find is that he is unfit to carry a weapon. I hear that there's a medical disability, I hear that he's completely and totally disabled and permanently disabled from the New Jersey Department of Corrections. And I have no, nothing before me from him by way of testimony, by way of records, by way of anything to indicate to me that he is not incapable or unfit to carry a firearm.

I'm not basing my finding on the medical, the mental disability. That testimony came in by somebody who had a conversation with your client. And I heard absolutely nothing to contradict it, or to even to establish a basis at all. *So, I'm going to have to assume, based upon the fact that the defendant did not take the stand, and based upon the fact that I heard nothing or could see nothing with regard to what, if anything, this disability was, that he is in fact unfit.* (Emphasis added.)

## II

In 2003, the Legislature amended the Prevention of Domestic Violence Act to require law enforcement officers, who have probable cause to believe that an act of domestic violence has been

committed, to: (1) inquire as to the presence of weapons on the premises; (2) seize any weapon the officer reasonably believes would expose the victim to a risk of serious bodily injury; and (3) also seize any firearm purchaser identification card or permit to purchase a handgun issued to the person accused of committing domestic violence. *N.J.S.A.* 2C:25–21d(1)(a), (1)(b). By so doing, the Legislature signaled its clear concern with the increased danger posed by firearms in the hands of those charged with domestic violence.

 It is now well-settled that the voluntary dismissal of a domestic violence complaint does not mandate the automatic return of any firearms seized by law enforcement officers in connection therewith. *In re Return of Weapons to J.W.D.,* 149 *N.J.* 108, 110, 693 *A.*2d 92 (1997); *State v. One Marlin Rifle,* 319 *N.J.Super.* 359, 371, 725 *A.*2d 144 (App.Div.1999); *State v. Freysinger,* 311 *N.J.Super.* 509, 515, 710 *A.*2d 582 (App.Div.1998); *State v. Volpini,* 291 *N.J.Super.* 401, 412, 677 *A.*2d 780 (App.Div.1996). The State retains the statutory right to seek the forfeiture of any seized firearms provided it can show that defendant is afflicted with one of the legal "disabilities" enumerated in *N.J.S.A.* 2C:58–3c.

Within forty-five days of seizure, the State can petition the Family Part for a forfeiture order "to obtain title to the seized weapons, or to revoke any and all permits, licenses and other authorizations for use, possession, or ownership of such weapons." *N.J.S.A.* 2C:25–21d(3); *State v. Wahl,* 365 *N.J.Super.* 356, 362, 839 *A.*2d 120 (App.Div.2004). The proceedings are to be conducted in a summary fashion and the burden of proof is upon the State to show, by a preponderance of the evidence, that forfeiture is legally warranted.

After the hearing the court shall order the return of the firearms, weapons and any authorization papers relating to the seized weapons to the owner if the court determines the owner is not subject to any of the disabilities set forth in *N.J.S.A.* 2C:58–3c. and finds that the complaint has been dismissed at the request of the complainant and the prosecutor determines that there is insufficient probable cause

to indict; or if the defendant is found not guilty of the charges; or if the court determines that the domestic violence situation no longer exists.

[*N.J.S.A.* 2C:25–21d.]

*N.J.S.A.* 2C:58–3c contains eight separate statutory "disabilities," any one of which is legally sufficient to deny the issuance of a permit to own and possess a firearm. In the course of the hearing here, the court discussed the applicability of disabilities (2) and (5), which read as follows:

No handgun purchase permit or firearms purchaser identification card shall be issued:

\* \* \* \* \* \* \* \*

(2) To any drug dependent person as defined in [*N.J.S.A.* 24:21–2], to any person who is confined for a mental disorder to a hospital, mental institution or sanitarium, or to any person who is presently an habitual drunkard;

\* \* \* \* \* \* \* \*

(5) To any person where the issuance would not be in the interest of the public health, safety or welfare;

[*N.J.S.A.* 2C:58–3c.]

Disability (2) is not applicable on its face because the State did not present any evidence that defendant was ever drug dependent, confined for a mental disorder or was, at the time of the hearing, a "habitual drunkard." In this light, the hearing judge correctly focused her analysis on disability (5).

This broadly worded disqualification criterion eludes precise definition. We are satisfied, however, that it must be liberally construed to effectuate the overarching public policy objectives of the Prevention of Domestic Violence Act. That is, to afford "maximum protection" to victims of domestic violence. *N.J.S.A.* 2C:25–18; *See also State v. Volpini, supra,* 291 *N.J.Super.* at 408–09, 677 *A.2d* 780. A trial court must therefore be mindful that individuals who pose a general threat to the public health, safety or welfare may pose an even more immediate and defined threat to those who have been the direct recipients of their violent conduct. That threat is not necessarily extinguished after the vacation of judicially imposed restraints.

Thus, a judicial declaration that a defendant poses a threat to the public health, safety or welfare involves, by necessity, a fact-sensitive analysis. It requires a careful consideration of both the individual history of defendant's interaction with the former plaintiff in the domestic violence matter, as well as an assessment of the threat a defendant may impose to the general public.

These guiding legal principles notwithstanding, we stress that no matter what the subject matter, a judge sitting as the trier of fact is always obligated to impartially, rationally and dispassionately make factual findings that are supported by competent and credible evidence. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974); *R.* 1:7–4. This duty is never more important than when it is tested against the backdrop of a vitally important public policy concern like the one involved here.

Guided by this responsibility, we have not hesitated to set aside a trial court's forfeiture ruling when it was not supported by sufficient competent evidence. In *One Marlin Rifle, supra*, the trial court found that defendant posed a threat to public health, safety and welfare and ordered forfeiture of the firearm. The court's ruling was based, in pertinent part, on the testimony of defendant's former wife, who was also a certified clinical nurse specialist. At the forfeiture hearing, she testified as to her husband's mental condition and his use of the drug Paxil, which she described as an "anti-depressant drug used both to treat depression in 'an agitated form' as well as to control the behavior of persons suffering from 'intermittent explosive disorder.'" *Id.* 319 *N.J.Super.* at 365, 725 *A.*2d 144.

On appeal, we held that, although medically trained, the wife was not qualified to offer an opinion as to her husband's mental condition because *N.J.S.A.* 45:11–23b prohibits a nurse from providing a medical diagnosis. *One Marlin Rifle, supra*, 319 *N.J.Super.* at 369, 725 *A.*2d 144. Moreover, even if she met the threshold qualification requirement to provide a diagnosis, her testimony constituted a net opinion, not supported by competent evidence combined with medical analysis. *Id.* at 372, 725 *A.*2d 144.

Thereafter, we reversed the trial court's forfeiture ruling because the State failed to present sufficient credible evidence from which to conclude that defendant posed a threat to the public health, safety or welfare:

> The evidence of harassment and 'outbursts' described by [defendant's wife], appears more aptly described as frustration surrounding the marital break-up, rather than psychological behavioral outbursts. Even [defendant's wife] conceded that this was a distinctly possible explanation of her estranged husband's behavior. Furthermore, [the wife's] testimony was self-serving and cloaked in medical terminology that lacks proper foundation.
> [*Ibid.*]

■ Here, the evidence presented by the State in support of its forfeiture application is even less compelling. There is no evidence that defendant's former wife has any medical training or that defendant was taking anti-depressant medication at the time of the hearing or had ever been treated for a psychiatric disorder. The single isolated statement attributable to defendant, that his disability pension was due mostly to an unspecified "mental" problem, is utterly insufficient to support any finding that defendant poses a threat to the public health, safety or welfare.

■ Notwithstanding these deficiencies, we are satisfied that the record here provides a sufficient basis to question defendant's fitness to possess a firearm. Our conclusion is based on three separate pieces of evidence: (1) defendant's permanent disability pension from his position as a State Corrections Officer; (2) his former wife's testimony that defendant told her that his disability pension was based mostly on his "mental" condition; and (3) defendant's failure to rebut the logical inference to be drawn from this evidence; namely, that the Division of Pensions and Benefits found defendant unfit to perform the duties of a Corrections Officer due, at least in part, to an unspecified "mental" problem.

Once this evidence was before the court, it had a rational basis to question defendant's fitness to possess a firearm under *N.J.S.A.* 2C:58-3c(5). Moreover, because defendant's possession of the firearm here is incidental to his former position as a State Corrections Officer, any information bearing upon his fitness to

perform the duties of that office is directly probative of whether his continued possession of his service weapon constitutes a threat to the public health, safety or welfare.

Defendant nevertheless objected to the court reviewing his retirement file asserting patient/physician privilege. *N.J.R.E.* 506. Although not cited by either party, we also recognize that *N.J.A.C.* 17:1–1.2(c) provides that "medical testimony obtained ... for disability retirement shall be restricted for the confidential use of the Boards of Trustees" of the Division of Pensions and Benefits.

We are satisfied, however, that in these circumstances, defendant's right to keep confidential the medical information provided to the Division of Pensions and Benefits is subordinate to the public's interest in preventing individuals deemed statutorily unfit from possessing firearms. The Supreme Court has acknowledged that, even in the absence of statutory authority, there are circumstances in which a court may override a claim of privilege. In *In Re Kozlov,* 79 *N.J.* 232, 398 *A.*2d 882 (1979), the Court articulated three "foundations" that must be established in order to find an implied waiver of a recognized privilege. There must be (1) a legitimate need for the evidence; (2) the evidence must be relevant and material to the issue before the court; and (3) by a fair preponderance of the evidence, the party must show that the information cannot be secured from any less intrusive source. *Id.* at 243–44, 398 *A.*2d 882.

Thus, applying the *Kozlov* three-part test, we have held that a plaintiff in a medical malpractice case had effectively created a limited waiver of the psychologist/patient privilege by placing her emotional and mental state in issue based, in part, on her demand for psychological distress damages. *Arena v. Saphier,* 201 *N.J.Super.* 79, 88–91, 492 *A.*2d 1020 (App.Div.1985). In order to protect the holder of the privilege from undue disclosure, the judge should ordinarily examine confidential information *in camera. Irval Realty v. Bd. of Pub. Util. Comm'rs,* 61 *N.J.* 366, 375, 294 *A.*2d 425 (1972); *State v. Kunz,* 55 *N.J.* 128, 145, 259 *A.*2d

895 (1969); *United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 563, 483 *A.*2d 821 (App.Div.1984); *DeGraaff v. DeGraaff,* 163 *N.J.Super.* 578, 583, 395 *A.*2d 525 (App.Div.1978).

Here, by falling under the jurisdiction of the Family Part, defendant placed his continued fitness to possess a firearm directly into question. In this context, the applicability of all three *Kozlov* factors is obvious. Under the express provisions of *N.J.S.A.* 2C:25–21d(3), the State has a clear interest in preventing statutorily "unfit" persons from possessing firearms. The medical evidence substantiating defendant's disability pension from his position as a State Corrections Officer is directly relevant to determining whether he is fit to possess a firearm. Finally, this type of medical information cannot, by definition, be found in any other place.

Defendant, of course, should not be denied his interest in maintaining the confidentiality of these records. He must understand, however, that he cannot have it both ways. If he persists in asserting his right not to disclose the records, the trial court is empowered, based on the other evidence before it, to infer that these records would furnish no basis for resisting the forfeiture application and to conclude, therefore, that forfeiture should be ordered in the public interest. To minimize the intrusion on defendant's privacy, defendant may insist that judicial examination of these records be conducted *in camera,* and outside the presence of the attorney prosecuting the forfeiture action. Any disclosure of privileged information must be strictly limited to data necessary to substantiate the court's judgment of forfeiture.

We therefore vacate the order of forfeiture in this matter, and remand for reconsideration in light of the principles we have posited.

Reversed and remanded.