**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1029-17T3

IN THE MATTER OF THE
SEIZURE OF WEAPONS
BELONGING TO R.M.

_____

Submitted July 23, 2018 – Decided November 19, 2018

Before Judges Whipple and Suter.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FO-02-0085-18.

Dennis Calo, Acting Bergen County Prosecutor, attorney for appellant State of New Jersey (Justin M. Blasi, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Breslin & Breslin, PA, attorneys for respondent R.M. (Kevin C. Corriston, on the brief).

PER CURIAM

The State appeals the October 24, 2017 order denying its weapons forfeiture motion against respondent R. M., following a bench trial. We affirm the order.

On July 5, 2017, the Bergen County Prosecutor (State) filed a forfeiture motion to prevent the return of a handgun to respondent and related items seized by the Englewood Police Department (Englewood), pursuant to N.J.S.A. 2C:25-21, when respondent was arrested two months earlier and charged with second-degree assault, N.J.S.A. 2C:12-1(b)(1).[1]  The items included a Glock model 23 and its magazine, two permits to purchase handguns, respondent's firearms purchaser identification card, and a handgun case.  The State requested forfeiture under N.J.S.A. 2C:25-21(d)(3) and N.J.S.A. 2C:58-3(c).  Englewood also objected to returning the weapon because respondent had "shown himself to be an irresponsible and unqualified gun owner and that his possession of any handgun, or other weapon, may endanger the well-being and safety of others involved in his life as well as the general community."

We relate the facts from the bench trial.  On May 13, 2017, the Englewood police responded to a report of a domestic violence assault at respondent's residence.  He was not present when they arrived.  Officer Dylan Donegan found T.L. there with "scratches on both of her hands and forearms."  She also "started getting red marks around her wrists."  Donegan described the wounds as

---

[1] This charge subsequently was dismissed.

"defensive."  He was not permitted to testify, however, about what T.L. told him of the incident because T.L. was not present to testify and there was no "other competent evidence, corroborating evidence to allow the hearsay to be considered by the [c]ourt."  Donegan did not speak with respondent nor observe whether he had defensive wounds.

Detective Christopher Quirk testified that T.L. "had a few fingernails ripped off of her hands, she had some bruising around her neck and [possibly] some lacerations in her face, or might have been her lip . . . ."  The lacerations were described as "minor."

The police made contact with respondent and he turned himself in, as directed.  Respondent acknowledged to Quirk that he had been involved in a physical altercation with T.L., but said T.L. was the "primary aggressor," requiring him to defend himself.  Respondent had physical signs of injuries.  Respondent told Detective Quirk that T.L. became upset with him because he was wearing a necklace with the initial "T" from another girlfriend (T.D.), who was pregnant with his twins.

T.D. was an eyewitness to the physical altercation with T.L.  She now is the mother of respondent's twin children, but at the time, she was five months pregnant.  She gave respondent a necklace with her initial "T."  On May 13,

3

2017, she went to respondent's house where she found T.L. "attacking" respondent, who was "sitting in the kitchen on a chair." According to T.D., T.L. was "slapping him, scratching him and was smacking [him] in his face." Respondent was "pushing his hand out and trying to stop [T.L.]." When T.L. saw T.D., she "tried to come after [her]." T.D. returned to her car, with respondent, but T.L. followed. T.L. tried to "hit [T.D.'s] car from the side and in the back." T.D. testified respondent had scratches on his chest, neck and face, "[h]is shirt was ripped," and he had a bite mark on his hand.

Respondent's testimony confirmed that T.L. had given him a ride from the airport, but she became upset because of the necklace he was wearing with the initial for his girlfriend. T.L. was hitting him when T.D. arrived. He left with T.D.

Respondent was arrested once he turned himself in. Officer Juan Moreno testified the police reviewed a questionnaire with respondent to determine if he had any illnesses. Moreno testified that "one of the questions is do you want to harm yourself in any way," to which respondent answered "yes." The police followed up, asking respondent "when did [he] want to harm himself, and he said right now."

A-1029-17T3

Respondent admitted he told the police he had thought of harming himself "in situations like this when I did nothing, yes, 'cause I'm upset." He explained to the police that he was "not going to hurt [him]self, [he] was joking with the officer when [he] said it . . . ." He admitted he was "very upset" and cursed at the officer who would not let him use the bathroom.

Respondent was taken by ambulance to the Bergen Regional Medical Center (Bergen Medical) emergency room, arriving at about 11 p.m. Moreno testified respondent was not cooperative with the nurses. Because respondent was under arrest, Moreno stayed at the hospital all night and one of respondent's hands was handcuffed to the bed. Moreno testified respondent was "upset at me, he was cursing me out, telling me to fuck myself all night."

The Bergen Medical records were admitted in evidence by consent of the parties. They showed that following a fifteen minute medical examination, respondent was diagnosed with an "unspecified depressive disorder" and suggested ruling out "an adjustment disorder with mixed disturbance of emotion and conduct." Outpatient treatment was recommended. Respondent testified he was not given any medications.

A-1029-17T3

He was released from Bergen Medical at about 10 a.m. the next day and was taken to jail because he remained under arrest. He was released later in the day, but was required to wear an ankle monitor.

Respondent owned two handguns. The Ruger was confiscated by the New York City Police Department (NYPD), following a motor vehicle stop about two months earlier. He was arrested and later pled guilty to a disorderly conduct misdemeanor, but as part of that plea, he agreed to forfeit the gun to the NYPD. His second gun, the Glock model 23, is the subject of the State's forfeiture motion.

When respondent was released from jail, he returned to the police station, as agreed, with his Glock model 23, the magazine, two permits to purchase handguns, his firearms purchaser identification card, and a handgun case. Respondent also had a document that showed the Ruger was in the possession of the NYPD. Englewood confirmed that with the NYPD.

T.D. testified respondent had not previously expressed a desire to commit suicide, nor was she aware that he had any mental health issues. He was employed, was not aggressive, and did not threaten her. He used his gun for target practice because he was hoping to become a police officer. Their twins were born in August 2016. She was not concerned if he had a gun; it was not

accessible to the children. Respondent had not received any mental health treatment either before or after this incident.

After the October 24, 2017 bench trial, the court ordered the Glock and other items returned to respondent.[2] In an oral opinion, the court found no legal justification to bar return of the weapon. The court found respondent to be credible based on the "very forthright manner" in which he answered questions. He was "non-hesitant," and was not "stumbling over his testimony." He made "good eye contact with the [c]ourt." Based on all of the testimony, the court found "he acted in self-defense and that [T.L.] was the aggressor here . . . ." The court gave "a lot of weight to the fact that [respondent] did testify" even though he was not required.

Based on Detective Quirk's testimony, the court concluded that T.L "was upset with [respondent] because she found out he had another girlfriend." Although respondent cursed at the police and was not cooperative, the court looked at the totality of the circumstances, concluding "this all was one series of events" and that because he was not "released from the get-go…one thing led to another." She found respondent was "angry and frustrated" and he made an

---

[2]  This was subject to an NCIC check, proof of ownership and of safety equipment to secure the weapon.

A-1029-17T3

"offhand comment to the police." The court found T.D. to be a truthful witness who was "concise, level-headed [and] rational." The court found her testimony "persuasive and compelling" because she knew respondent well and "had no problem with any guns going back to [him]."

The court rejected the State's argument that respondent was disqualified because he had been "confined for a mental disorder" within the meaning of the statute. After thoroughly reviewing the records from Bergen Medical, including the lack of any affidavits from a psychiatrist and the unspecified diagnoses in the records, the court concluded this was a "quick screening" and not a confinement. "He was under arrest, he had no choice but to get screened…."

The court dismissed the complaint under N.J.S.A. 2C:58-3(c)(3), finding respondent did not suffer from:

> a physical disorder, mental disorder, or alcoholism. He has never been treated, by his testimony and the hospital record . . . he has no history of mental illness . . . he's never taken any psychotropic medication, he's not taking psychotropic medication, he's not treated by a psychologist or psychiatrist at the present time.

The court also found the State had not met its burden under N.J.S.A. 2C:58-3(c)(5), because it had not proven respondent was a "threat to the health, safety or welfare of the public at large under the c(5) disqualifier." The officers

who testified "really just described the res gestae or the happenings of the evening."

We granted a stay of the October 24, 2017 order on December 6, 2017.

On appeal, the State contends the return of respondent's weapon is contrary to the public's health, safety and welfare under N.J.S.A. 2C:58-3(c)(5). It also argues the trial court erred by finding respondent was not disqualified under N.J.S.A. 2C:58-3(c)(3) because, following his statement about suicide, he was "confined for a mental disorder." The State asserts the court erred by ruling the police officers could not testify about what T.L. told them about the incident. We do not agree with these arguments.

In reviewing a trial court's decision in a forfeiture case, we defer to the judge's factual findings, so long as they are supported by substantial credible evidence. State v. Cordoma, 372 N.J. Super. 524, 535 (App. Div. 2004). We owe particular deference to the trial court's credibility determinations. State v. Locurto, 157 N.J. 463, 474 (1999); Cesare v. Cesare, 154 N.J. 394, 412 (1998). In matters involving firearm permits and the forfeiture of weapons in conjunction with domestic violence, we may only "set aside a trial court's forfeiture ruling when it was not supported by sufficient competent evidence." Cordoma, 372 N.J. Super. at 535. Nevertheless, it is well established that our

review of a judge's conclusions of law is plenary. <u>Manalapan Realty, LP v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

Under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, an officer who finds probable cause to believe that an act of domestic violence has been committed shall "seize any weapon that the officer reasonably believes would expose the victim to a risk of serious bodily injury." N.J.S.A. 2C:25-21(d)(1)(b). This includes seizure of the purchaser identification card and permit to purchase a handgun. These weapons and items are to be returned except upon order of the Court. The State can petition to obtain title to the weapons seized and to revoke any permits, licenses or authorizations. N.J.S.A. 2C:25-21(d)(3). It may object to the return of the weapons "on the ground that the owner is unfit or that the owner poses a threat to the public in general or a person or persons in particular." <u>Ibid.</u>

"It is now well-settled that the voluntary dismissal of a domestic violence complaint does not mandate the automatic return of any firearms seized by law enforcement officers in connection therewith." <u>Cordoma</u>, 372 N.J. Super. at 533

A-1029-17T3

(citations omitted).  After a summary hearing, the court can order a return of the

seized weapons if the court

> determines the owner is not subject to any of the
> disabilities set forth in N.J.S.A. 2C:58-3(c) and finds
> that the complaint has been dismissed at the request of
> the complainant and the prosecutor determines that
> there is insufficient probable cause to indict; or if the
> defendant is found not guilty of the charges; or if the
> court determines that the domestic violence situation no
> longer exists.
>
> [N.J.S.A. 2C:25-21(d)(3).]

Here, the State requested the forfeiture of respondent's weapon, under

N.J.S.A. 2C:58-3(c), subsections (3) and (5), which provide that "no handgun

purchase permit or firearms purchaser identification card shall be issued:"

> (3) To any person who suffers from a physical defect or
> disease which would make it unsafe for him to handle
> firearms, to any person who has ever been confined for
> a mental disorder, or to any alcoholic unless any of the
> foregoing persons produces a certificate of a medical
> doctor or psychiatrist licensed in New Jersey, or other
> satisfactory proof, that he is no longer suffering from
> that particular disability in a manner that would
> interfere with or handicap him in the handling of
> firearms. . . .
>
> . . . .
>
> (5) To any person where the issuance would not be in
> the interest of the public health, safety or welfare.

[N.J.S.A. 2C:58-3(c)(3) and (5) (emphasis added).]

We conclude the trial court did not err by finding the State did not meet its burden of proving by a preponderance of the evidence that the statutory disqualifiers were met. We defer to the court's credibility findings. "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Cesare, 154 N.J. at 412 (alterations in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).

Here, the trial court found respondent's testimony to be "very forthright." T.D.'s testimony was "concise, level-headed, [and] rational." The police officers testified about a domestic violence incident, but other than proving an altercation had occurred, which respondent admitted, the State did not show respondent was the aggressor. T.L. did not testify. The only other eyewitness, T.D., testified for respondent that he was defending himself against T.L. Respondent had no history of violence nor was T.D afraid of him. There was no medical testimony that respondent was a threat to others.

The State contends respondent is disqualified under N.J.S.A. 2C:58-3(c)(3) because he was "confined for a mental disorder." We agree with the trial

12

court, however, that the screening which occurred here, was not confinement for a mental disorder within the meaning of that statute.

The legislature did not define confinement. It is generally defined as "[t]he act of imprisoning or restraining someone; the quality, state or condition of being imprisoned or restrained." Black's Law Dictionary 362 (10th ed. 2014). Under N.J.S.A. 30:4-27.6(a), a police officer is authorized to "take custody" of a person and to take them immediately to a "screening service" if "[o]n the basis of personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment to treatment." A screening service is a:

> facility in the public mental health care treatment system wherein a person believed to be in need of involuntary commitment to outpatient treatment, a short-term care facility, psychiatric facility or special psychiatric hospital undergoes an assessment to determine what mental health services are appropriate for the person and where those services may be most appropriately provided in the least restrictive environment.
>
> [N.J.S.A. 30:4-27.5(a).]

That screening service can provide "emergency and consensual treatment to the person receiving the assessment" and may "detain the person up to [twenty-four] hours for the purposes of providing the treatment and conducting the

13

assessment." Ibid. The mental health screener completes a "screening document prescribed by the division." Then "[i]f a psychiatrist, in consideration of this document and in conjunction with the psychiatrist's own complete assessment, concludes that the person is in need of commitment to treatment, the psychiatrist shall complete the screening certificate." N.J.S.A. 30:4-27.5(b).[3]

Here, respondent was under arrest when he was taken for a mental health assessment because he acknowledged he told the police he wanted to harm himself. The medical records from Bergen Medical emergency room were in evidence by consent. There was no indication that a psychiatrist made more than a fifteen-minute examination rather than a complete assessment based on a screening document. The State did not present the testimony of a medical doctor or psychiatrist. Instead, it relied simply on the fact that the police took respondent to the facility while he was under arrest where he remained for eleven

---

[3] In contrast, a "short-term care facility" is defined in part as "an inpatient, community based mental health treatment facility which provides acute care and assessment services to a person with mental illness whose mental illness causes the person to be dangerous to self or dangerous to others property." N.J.S.A. 30:4-27.2(bb). "A short-term care or psychiatric facility . . . may detain a person, admitted to the facility involuntarily by referral from a screening service without a temporary court order, for no more than [seventy-two] hours from the time the screening certificate was executed." N.J.S.A. 30:4-27.9(c). There was no conclusion in the records that respondent was a danger to himself or others or that he advanced beyond the initial screening.

hours for an assessment. We agree with the trial court that in these circumstances, this assessment was not "confine[ment] for a mental disorder" within the meaning of N.J.S.A. 2C:58-3(c)(3), disqualifying him from the return of his weapon.

The case of Perona v. Township of Mullica, 270 N.J. Super. 19 (App. Div. 1994) does not lead to a different result. In Perona, we held that the term "confine a person for mental illness or drug dependence" as used in N.J.S.A. 59:6-6(a)(1) was satisfied by the actions of the police in taking custody of a person under N.J.S.A. 30:4-27.6 to take them to a screening service. Id. at 28. However, that case addressed the Tort Claims Act and not the statute in question here. There is no indication the use of the term in one statute was to be construed the same in others.

The State also argues that respondent was disqualified under N.J.S.A. 2C:58-3(c)(5) because the return of his weapon "would not be in the interest of the public health, safety or welfare." In Cordoma, we said:

> a judicial declaration that a defendant poses a threat to the public health, safety or welfare involves, by necessity, a fact-sensitive analysis. It requires a careful consideration of both the individual history of defendant's interaction with the former plaintiff in the domestic violence matter, as well as an assessment of the threat a defendant may impose to the general public.

15

[372 N.J. Super. at 535.]

The trial court carefully analyzed the full record including all of the medical records provided by the State in concluding respondent was not a threat. It found respondent credible in his assertion that he was defending himself. There was an eyewitness, who also was found to be credible. T.D. knew respondent well and was not afraid or concerned with his possession of a gun. The comment about suicide was made at a time when respondent was frustrated and angry. There was no evidence to support Englewood's claim that respondent was "irresponsible" or an "unqualified gun owner."

The State argues that the court erred by not allowing the officers to testify about what T.L. said to them on May 13, 2017, about the altercation. We review this evidence ruling based on an abuse of discretion standard.

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Scott, 229 N.J. 469, 479 (2017) (alteration in original) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). We therefore apply a deferential standard in reviewing a trial court's evidentiary rulings and uphold its determinations "absent a showing of an abuse of discretion." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). A reviewing court must not

16

"substitute its own judgment for that of the trial court," unless there was a clear error in judgment — a ruling "so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Hearsay testimony is admissible in cases such as this provided there is "sufficient legally competent evidence to support the court's findings." In re Z.L., 440 N.J. Super. 351, 358 (App. Div. 2015). However, "a fact finding or a legal determination cannot be based upon hearsay alone." Weston v. State, 60 N.J. 36, 51 (1972). Hearsay can be used to "corroborate competent proof." Ibid. "[I]n the final analysis for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it." Ibid.

Here, the proffered testimony by the officers about what T.L. said, was hearsay. T.L. was subpoenaed, but did not appear. She lived out of state and the State had not asked for a commission. There was no corroborating testimony that respondent was the aggressor. There was a physical altercation and T.L. had defense wounds according to one officer. However, that officer did not see the wounds on respondent to determine if they also were defensive. There was eyewitness testimony that T.L. was the aggressor, not respondent. The letter from Englewood that respondent had "shown himself to be an irresponsible and

17

unqualified gun owner" was not supported by the evidence.  As such, the court did not abuse its discretion by excluding the hearsay testimony.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1029-17T3