**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2996-23

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

WEAPONS SEIZED FROM
N.B. ON FEBRUARY 7, 2024,

      Defendant-Appellant.

_____

Submitted September 11, 2025 – Decided October 28, 2025

Before Judges Smith and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FO-03-0450-24.

Evan F. Nappen Attorney at Law, PC, attorneys for appellant (Louis P. Nappen, on the brief).

LaChia L. Bradshaw, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

N.B.[1] appeals from an April 25, 2024, Family Part order granting the State's application for forfeiture of his firearms, ammunition, and Firearms Purchaser Identification Card (FPIC) seized by law enforcement under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

I.

On the eve of the parties' divorce hearing, L.B. obtained a temporary restraining order (TRO) against N.B. To support the emergent relief, L.B. reported

> [N.B.] and her are gettin[g] a divorce and have been living separate since [July 30, 2023.] [L.B.] and [N.B.] both live in the sam[e] gated community[.] [L.B.] stated that the divorce papers will be signed tomorrow[,] [February 7, 2024,] and that [N.B.]'s harassing behavior has been escalating[.] [L.B.] stated that on [February 5, 2024,] between the hours of 1700 and 1900, [N.B.] was outside of her residence banging on the windows and doors trying to get [L.B.] to come outside to speak with him, while calling [L.B.]'s cell phone and her aunt's cell phone. [L.B.] stated that a short time later when she left the residence to go to Starbucks in Burlington Twp she witnessed [N.B.] waiting around the corner in his vehicle. [N.B.] then followed [L.B.] to the Starbucks where he exited his vehicle and confronted her in the drive thru [sic] lane. Begging her to talk to him, [L.B.] stated that she has

---

[1] Given the nature of this case and the allegations of domestic violence in this matter, we refer to the parties by their initials. R. 1:38-3(d)(9) to (10).

A-2996-23

received approximate[l]y [three] text messages from [N.B.] in the last 48 hours[.] [L.B.] states that [N.B.] owns firearms and ammo and has made vague statements that [L.B.] believes are suicidal.

After N.B. was notified of the existence of the TRO, he proceeded to the police station where he was served with the order by Sgt. David Mueller of the Mansfield Township police department. During the discussions, Sgt. Mueller asked N.B. whether he owned any firearms. When N.B. indicated he did, Sgt. Mueller inquired as to the weapon's whereabouts. N.B. initially stated the weapon was stored at his cousin's home in Pennsylvania. This proved to be untrue, and attempts to retrieve that weapon were unsuccessful. N.B. then suggested it might be in a Mount Holly storage unit. The firearm was not located there either. N.B. ultimately located the weapon at his sister's home and surrendered it to the police later that day.

At L.B.'s request, the Family Part dismissed the TRO. Thereafter, the State moved for the forfeiture of N.B.'s weapon and FPIC because of N.B.'s "history of domestic violence," in the interest of "public safety," and to preserve the "public health, safety or welfare," citing to N.J.S.A. 2C:25-21(d)(3), N.J.S.A. 2C:58-3(c)(5). During the preliminary hearing on this application, N.B. acknowledged the firearm, which was previously in his

3

possession, had been removed prior to the incident leading to the TRO, because of certain "anger issues" to which he admitted.

The State called Sgt. Mueller as its only witness at the plenary forfeiture hearing. Sgt. Mueller acknowledged N.B. was "cooperative, friendly, [and] understanding" during the investigation but also expressed concern regarding N.B.'s lack of immediate knowledge of the weapon's location stating, in his view, that responsible gun ownership requires constant awareness of a firearm's location.

N.B. called his friend, G.L. who testified to the stressful state N.B. was in the days preceding the divorce hearing and during the TRO proceedings. G.L. admitted "given the situation because the TRO was outstanding, that it wouldn't be a good idea for [N.B.] to have a weapon in his hands."

N.B. also called L.B. She testified briefly about her observations of N.B. in the days before her request for a TRO and expressed her concerns about N.B.'s escalating behavior in attempting to reconcile with her. She sought court after observing N.B. was "distraught because of everything going on" including the "suicidal statements" noted in the order. L.B. specifically noted she "was worried about [N.B.] hurting himself. I didn't say with his gun, I just said I was worried about him hurting himself." L.B. also

4

A-2996-23

acknowledged N.B. owned a weapon that he stored "under his mattress" before their son was born. L.B. acknowledged N.B. threatened her in the past and admitted she "feared for her safety" but "not involving the gun." L.B. also acknowledged N.B.'s decision to remove the weapon from their home "for safety reasons."

N.B. acknowledged the interactions he had with L.B. before the TRO was issued. N.B. stated:

> During 2021, I had the gun removed because things were getting intense between [L.B.] and I. And I said, you know what, it's not—I talked to her cousin and her cousin says, you know what [N.B.], he says let's just get the firearm out of there because you never know what's going to happen. I said you know what, nothing is really going to happen but I took the suggestion.

Consequently, N.B. "stuck [the weapon] in the trunk of [his] car, drove over to Bensalem, [Pennsylvania] . . ." and asked L.B.'s cousin to "hold this for [him] for awhile until this all clears out." Later, N.B. learned the cousin "gave [the] weapon to [N.B.'s] sister." Despite these transfers, N.B. "knew where [the weapon] was the whole time." To explain his inability to locate the weapon immediately, N.B. attributed his purported lack of recollection to the "duress" he experienced with "what was going on with [his] marriage" and certain personal medical conditions. N.B. also testified that when he did

5

remember where the weapon was, he "went to [his] sister's house, [located the weapon] underneath her bed, and forfeited like [Sgt. Mueller] asked me to do."

After summations, the trial judge considered the testimony of the witnesses and determined both L.B. and N.B. were credible "for the most part" while Sgt. Mueller was "extremely credible." Factually, the trial judge noted his "biggest" and "overarching concern" lay with what he determined to be "incorrect" information N.B. gave to Sgt. Mueller about the location of the weapon. According to the court, N.B.

> didn't know where it was. Because he said it's at my cousin's house in Bensalem. That wasn't true. And not because he was lying, because he simply could not remember where that weapon was located.
>
> The next answer given to the Sergeant by his testimony wasn't that they were looking for a firearms ID card, it was that it wasn't in Bensalem. That did not turn out to be fruitful. And . . . defendant offered that, again he was being cooperative, offered that it was in a storage closet in Mount Holly. And that didn't bear out.
>
> [D]efendant, again having left, realized hey, you know what, I know where it is now. It's in Homestead. It's there. He went, he retrieved it to his credit and brought it back. And brought it back to the Sergeant that day.

Ultimately, the court found that it "comes down to a situation where when possessing a firearm one must have it guarded, protected, and secured

6

where you can control that possession. And clearly [] that wasn't the case for a period of time." N.B. "was not fully aware of where that weapon was on February 7[]." Consequently, the judge determined N.B. lacked the "essential character of temperament necessary to be entrusted with a firearm." Therefore, under N.J.S.A. 2C:58-3(c)(5), the trial judge determined "it is not in the interest of public health, safety[,] or welfare" for N.B. to possess weapons and permanently revoked N.B.'s FPIC.

N.B. appealed.

II.

It is axiomatic when we review a Family Part order we give a trial judge's evaluation "heightened deference" and cede to the judge's factual findings because of the judge's expertise in family matters. In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M., 225 N.J. 487, 506, 511 (2016). As such the trial judge's factual findings and legal conclusions will not be disturbed "unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interest of justice." Id. at 506. (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). However, we review a trial court's legal conclusions de novo. In re N.J.

A-2996-23

Firearms Purchaser Identification Card by Z.K., 440 N.J. Super. 394, 397 (App. Div. 2015).

III.

Under the PDVA, the State is empowered to forfeit firearms. See N.J.S.A. 2C:25-21(d)(3). The PDVA's purpose is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." F.M., 225 N.J. at 509 (quoting N.J.S.A. 2C:25-18). "Because the presence of weapons can heighten the risk of harm in an incident of domestic violence, the [PDVA] contains detailed provisions with respect to weapons." State v. Harris, 211 N.J. 566, 579 (2012). The PDVA allows a judge to issue a TRO that includes provisions to search for weapons. See State v. Hemenway, 239 N.J. 111, 116 (2019). It is well established the "voluntary dismissal of a domestic violence complaint does not mandate the automatic return of any firearms seized by law enforcement officers in connection therewith." State v. Cordoma, 372 N.J. Super. 524, 533 (App. Div. 2004). "The State retains the statutory right to seek the forfeiture of any seized firearms[,] provided it can show that defendant is afflicted with one of the legal 'disabilities' enumerated in N.J.S.A. 2C:58-3c." Ibid. To prevail, the State must prove that "forfeiture

A-2996-23

is legally warranted" by a preponderance of the evidence. F.M., 225 N.J. at 508 (quoting Cordoma, 372 N.J. Super. at 533).

N.B. presents a host of alleged errors including statutory compliance and constitutional issues – most of which were not raised before the trial court. We note these arguments were not raised at trial and, thus, we need not address them. State v. Dangcil, 248 N.J. 114, 132 n.4 (2021) (citing State v. Galicia, 210 N.J. 364, 383 (2012)). Although we may consider allegations of errors or omissions not brought to the trial judge's attention if they meet the plain error standard under Rule 2:10-2, we frequently decline to consider issues not raised below nor properly presented on appeal when the opportunity for presentation was available. Unless an issue (even one of constitutional dimension) speaks to the jurisdiction of the trial court or concerns matters of substantial public interest, we will generally not consider it. J.K. v. N.J. State Parole Bd., 247 N.J. 120, 138 n.6 (2021); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Following a review of the entirety of the record in this matter, we discern no error, and we affirm. The trial judge's factual findings and credibility determinations are well supported by the substantial credible

9

evidence in the trial record. We add these brief comments as to the issues properly before us.

A.

N.B. argues the trial court erred when it denied N.B. an opportunity to arrange for the transfer of his weapons to an appropriate person after the weapon was forfeited. We disagree because the controlling statute does not permit this relief. Under the statute, a trial court may permit the transfer of weapons to an appropriate person if it concludes the weapons should not be returned to their owner. N.J.S.A. 2C:25-21(d)(3). However, the express language of the statute only permits this relief "with respect to weapons other than firearms." Ibid. Since the only weapon involved is a firearm owned by N.B., this option does not apply to N.B.

B.

N.B. next argues the trial court erred by failing to identify a character of temperament issue as "elementally required" under N.J.S.A. 2C:58-3(c)(5). We disagree.

A weapon will not be returned "to any person where the issuance would not be in the interest of the public health, safety[,] or welfare because the person is found to be lacking the essential character of temperament necessary

10

to be entrusted with a firearm."  N.J.S.A. 2C:25-21(d)(3); N.J.S.A. 2C:58-3(c)(5).  Here, the trial court identified a confluence of factors, including the emotional tumult N.B. was experiencing immediately prior to the divorce, combined with his purported lack of knowledge regarding the whereabouts of his firearm—which he admittedly removed from the marital home due to the risk of using it to commit a harmful act—as sufficient to meet this test.  The record shows additional detail concerning N.B.'s escalating behavior in the days leading up to the issuance of the TRO.  This behavior alarmed L.B., as did the instances of unreported abuse she testified that she suffered at the hands of N.B.  We conclude that the record provides substantial and credible evidence for the trial court's determination.

C.

N.B. asserts the trial court erred when it based its decision on a "responsible person" standard prohibited by U.S. v. Rahimi, 602 U.S. 680 (2024), and also conflicts with the prohibition on improper firearm storage requirements as a weapons forfeiture of which the United States Supreme Court was critical in D.C. v. Heller, 554 U.S. 570 (2008).  We find no merit to these arguments.  They are grounded on an infirm premise and are unsupported by the substance of the trial court's decision.  In forfeiting N.B.'s weapon, the

11

trial judge did not limit the decision solely to the responsibilities possessed of a weapon owner nor of the requirement the weapon was improperly stored. The record is clear that the trial court focused on the present danger and the related lack of knowledge. This in turn created the public safety issue which caused the court to determine that N.B.'s weapon should be forfeited.

To the extent we have not addressed them, we have considered all the remaining points raised on appeal and deem them of insufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division