725 A.2d 144 (1999)
319 N.J. Super. 359
STATE of New Jersey, Plaintiff-Respondent,
v.
ONE MARLIN RIFLE, 30/30, 30 AS, Serial #12027068 with Scope and all other items listed on inventory sheet including items retained by the Oaklyn Police Department, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 22, 1999.
Decided March 16, 1999.
*145 Archer & Greiner, Haddonfield, for defendant-appellant (Nicholas C. Harbist and Patrick M. Flynn, on the brief).
Lee A. Solomon, Camden County Prosecutor, for plaintiff-respondent (Mark Chase, Assistant Prosecutor, of counsel and on the brief).
Before Judges PETRELLA and D'ANNUNZIO.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This is an appeal from a weapons forfeiture decision after a prior dismissal of a domestic violence complaint. John Silvaria, owner of the subject weapons, appeals from the Family Part Judge's decision ruling that he must forfeit his weapons as he was found in the forfeiture case to "pose a threat to public health, safety, or welfare" pursuant to N.J.S.A. 2C:58-3(c)(5). Silvaria argues that the judge erred in ordering forfeiture, and specifically in treating his estranged wife as an expert witness on mental illness, notwithstanding her being a certified clinical nurse specialist and an advanced practice nurse in mental health and psychiatric nursing. Silvaria also argues that his estranged wife expressed nothing more than a net opinion which should have been rejected.
Prior to the events that gave rise to the confiscation of Silvaria's weapons, he and his wife mutually agreed to separate and obtain a divorce. A consent order was entered on December 31, 1997 giving Mrs. Silvaria sole custody of their two-and-one-half year old daughter. The consent order also included visitation and child support arrangements.
Silvaria worked as a licensed physical therapist on a contract basis, accepting temporary thirteen-week assignments at health care facilities around the country. In November 1997, as Silvaria was preparing to leave for a new job assignment in Wisconsin, he returned to the marital residence to collect his belongings. Mrs. Silvaria stated that "[she] was actually helping him move out and it was ... going very well, very cooperative, it was a team effort." However, as the day went on, Mrs. Silvaria inquired when her husband was going to leave.
At some point in the evening, Silvaria approached his wife desiring to talk about what was going wrong with their marriage. Because Mrs. Silvaria was holding her daughter in her arms and one of Mrs. Silvaria's friends was in another room of the home, she felt it *146 was "not the time nor the place" to discuss this matter and an argument ensued. Mrs. Silvaria testified that her husband "became louder and louder and got closer to closer [sic] to her." Feeling uneasy, Mrs. Silvaria "asked him to back up." Silvaria did so and left the room without incident.
Disturbed about what had just happened, Mrs. Silvaria called the Oaklyn Police. When police arrived, Mrs. Silvaria insisted that "she wanted her husband out of the house, he was supposed to move out, get all of his things and just leave." The officer on the scene described Mrs. Silvaria's demeanor as "very scared, fearful." The officer said Mr. Silvaria was very cooperative and that:
He was ready to leave and we said you have to come back to the station. Called the Prosecutor's Office, they said take all of his weapons. We took them all out of his truck and that was basically it.
The police confiscated three rifles, two shotguns, a "BB" gun, a bow and arrows, a sword and various ammunition that apparently had already been loaded in Silvaria's truck. At the police station, Silvaria indicated that he owned a pistol, which he kept locked in a gun cabinet at the marital residence. A police officer returned to the marital residence and confiscated the pistol from that location.
On December 16, 1997, the State served notice of its intent to seek forfeiture of Silvaria's weapons. However, because it thereafter became known that Silvaria had moved to Wisconsin, Mrs. Silvaria and the State had no objections to returning the weapons to Silvaria and that was done pursuant to court order of December 31, 1997.
Although Silvaria had left the state of New Jersey, Mrs. Silvaria subsequently filed a domestic violence complaint on February 13, 1998 based upon several telephone contacts with Silvaria during the weeks following his relocation to Wisconsin.
The first telephone call occurred when Silvaria called to offer Christmas greetings. Eventually, the conversation deteriorated and Mrs. Silvaria decided that it would "not be a good idea" for Silvaria to see his daughter over the New Year's holiday. A second phone call occurred on February 7, 1998. At that time Silvaria called to arrange a date to collect some additional possessions from the marital residence. Mrs. Silvaria decided it was "not a good idea" for her husband to come alone and remove the remaining possessions. Also during this phone call, Silvaria apparently indicated that he was going to reclaim his weapons.
A third telephone call occurred on February 11, 1998. During this conversation Silvaria asserted that he wanted joint custody of his daughter and that he would stop support payments. He also indicated that he wanted to take his daughter to visit her grandmother in Massachusetts. Mrs. Silvaria would not consent and Silvaria is quoted as saying "We'll see, we'll see who's going to stop me from seeing my daughter whenever and with whomever I want." Also during this conversation, Mrs. Silvaria inquired about the guns asking Silvaria, "And where are you going to put them?" Silvaria replied "I certainly can't tell you that." Mrs. Silvaria said this made her feel vulnerable because Silvaria was concealing that information. Mrs. Silvaria testified, "I knew he was coming [to New Jersey] to get the guns, I wasn't sure what he was going to do with them."
Two days later Mrs. Silvaria filed a domestic violence complaint based on these phone calls. After a hearing on February 25, 1998, a different Judge found that Mrs. Silvaria failed to prove domestic violence and ordered dismissal of her complaint.
A few days later, the Camden County Prosecutor's Office, apparently at the behest of Mrs. Silvaria, moved for reconsideration of the December 31, 1997 order directing return of Silvaria's weapons. While most of the testimony presented during the reconsideration forfeiture hearing concerned events referred to in the dismissed domestic violence complaint, Mrs. Silvaria also testified to Silvaria's use of the drug Paxil and her former husband's mental condition. Mrs. Silvaria described Paxil as an anti-depressant drug used both to treat depression in "an agitated form" as well as to control the behavior of *147 persons suffering from "intermittent explosive disorder."[1]
Mrs. Silvaria cited as the basis for her assessment her qualifications as a certified clinical nurse specialist and as an advanced practice nurse in mental health and psychiatric nursing. Through her employment at Rainbow Health Care Associates, Mrs. Silvaria, under the supervision of doctors, performed psychiatric evaluations and essentially "prescribed" medication at outpatient facilities. She also noted that she had a master's degree.
Mrs. Silvaria testified that from October 1994 until their separation in November 1997, she provided her former husband with free samples of Paxil obtained from her office.[2] She testified that she believed that her husband was being treated for depression and weight problems beginning sometime in 1994. However, Mrs. Silvaria was "not sure to what degree he was on [the medication]."
Based upon her knowledge of her former husband's use of the drug Paxil, Mrs. Silvaria said during the 1998 forfeiture hearing that Silvaria suffered from a psychiatric condition causing outbursts of rage. Mrs. Silvaria thought that Silvaria's disagreements with her, as expressed in his earlier phone calls, especially his reaction to her denial of his requests to visit his daughter, resulted from a psychiatric problem and a failure to take Paxil to control it. Nevertheless, she was unable to say with any degree of certainty whether any of Silvaria's outbursts were symptomatic of a mental disorder, or whether they were simply normal emotional reactions.
Silvaria appeared pro se and admitted that he was, for a time, taking Paxil for treatment of depression and anxiety. He denied, however, that he took Paxil to prevent "outbursts." Silvaria also indicated that he stopped taking Paxil in August of 1996.
The judge accepted Mrs. Silvaria as an expert on the subject of psychiatric behavioral problems. Relying upon her "expert testimony," the judge vacated his previous order and ordered re-forfeiture of Silvaria's weapons saying:
[i]t would appear that since there is a possibility at least the mental deficiency that you possessor the mental deficiency that may exist, that there is very well a possible public health, safety or welfare problem.
On appeal, Silvaria challenges the judge's decision on the ground that there was no evidence that he posed a threat to any person or to the public health, safety or welfare. He also argues that the judge erred in treating Mrs. Silvaria as an expert. He challenges Mrs. Silvaria's testimony because: (1) Mrs. Silvaria does not have a medical license and is thus unqualified to give any type of expert testimony as to mental illness; (2) Mrs. Silvaria did not present the court with any qualifications in psychiatry or psychology; and (3) that the Nurses Practice Act, N.J.S.A. 45:11-23 to -52 prohibits persons in Mrs. Silvaria's position from giving a "medical diagnosis." Silvaria also argues that any expert testimony that she gave was nothing more than a net opinion and should not be considered.
Although the State on appeal does not appear to rely heavily on the expert testimony of Mrs. Silvaria, the State defends the ultimate decision of the Family Part judge by focusing on the fact testimony of Mrs. Silvaria that consisted mainly of the events described in the dismissed domestic violence complaint. Alternatively, the State suggests that this case be remanded, without treating Mrs. Silvaria's testimony as expert. Silvaria argues against such a remand because all essential testimony has already been provided.

I.
The question on appeal is whether Mrs. Silvaria's fact testimony was sufficient to sustain *148 the judge's decision. However, the judge did not specifically state he found these incidents to rise to a level of threat or danger to the public health or welfare. The judge instead specifically stated he relied upon the expert testimony of Silvaria's estranged wife who basically intimates that Silvaria suffers from a violent form of depression and that it was "possible" that Silvaria's actions amounted to a threat to the public welfare. The evidence does not support such a conclusion. Indeed, the judge's conclusions at the forfeiture hearing were at best speculative, and based on events which were previously found not to have constituted domestic violence at a domestic violence hearing. There was no warrant to revisit the findings in the earlier domestic violence proceeding at the forfeiture hearing. Hence, reversal is required.

II.
Further discussion is necessary on other issues raised. Silvaria argues that because Mrs. Silvaria is not a licensed psychiatrist or psychologist, she is incompetent to give expert testimony on mental illness. Silvaria relies on State v. Frost, 242 N.J.Super. 601, 577 A.2d 1282 (App.Div.1990), for the proposition that a "witness should generally be a licensed member of that profession" when providing expert testimony in a particular profession. Id. at 615, 577 A.2d 1282. This argument presents an overstatement of the law. Depending on the matter, such a limitation that all experts must possess a professional license is too broad. It is widely recognized that an expert witness on a medical subject does not have to be a person duly licensed to practice in that particular field of medicine. See State v. Hyde, 292 N.J.Super. 159, 167, 678 A.2d 717 (App.Div.1996).
Whether a witness has sufficient knowledge, learning, and experience to state an opinion as to one's mental condition as an expert is largely for the discretion of the trial court. Thus, the fact that Mrs. Silvaria is not a licensed psychiatrist or psychologist goes more to the weight of her testimony, not to its admissibility.
Although we recognize the discretion in the trial court to determine who may give expert testimony under our rules of evidence, it appears that Mrs. Silvaria does not possess the necessary qualifications to opine with respect to a medical diagnosis of her former husband's mental condition. Her qualifications as stated at the hearing were not adequate. Aside from potential bias problems, Mrs. Silvaria did not identify the subject of her master's degree. Furthermore, there is no indication how long she worked for Rainbow Health Care Associates, or even how long she had been certified as a nurse specialist in the field of mental illness. It may be that Mrs. Silvaria has experience with individuals who come under her care as a registered nurse who have mental illnesses, her work experience would usually involve assisting patients after doctors have made the actual diagnosis. See, e.g., 1711 Third Ave., Inc. v. Asbury Park, 16 N.J.Tax 174, 179 (Tax Ct.1996).
While the decision to permit a witness to testify as an expert generally rests within the sound discretion of the trial court, absent an abuse of discretion, the normal test for competency appears constrained here by a statutory provision limiting the practice of certain registered professional nurses.[3] We note in passing that N.J.S.A. 45:11-23b permits registered nurses to diagnosis human *149 responses to health problems, however, it prohibits them from providing a medical diagnosis. Hence, the statute recognizes a firm distinction between nursing diagnosis and medical diagnosis. A nursing diagnosis identifies signs and symptoms only to the extent necessary to carry out the nursing regimen rather than making final conclusions about the identity and cause of the underlying disease. See, e.g., Flanagan v. Labe, 547 Pa. 254, 690 A.2d 183, 185 (1997).
Here, Mrs. Silvaria's opinion testimony regarding the specific identity and cause of Silvaria's mental condition would clearly have constituted a medical diagnosis. Given the statute's prohibition against a nurse providing such a diagnosis, the trial court's acceptance of such testimony was inappropriate even aside from issues of the interest and potential bias of the witness. Cf. Palmisano v. Pear, 306 N.J.Super. 395, 401, 703 A.2d 966 (App.Div.1997); State v. Holmes, 290 N.J.Super. 302, 312-313, 675 A.2d 1125 (App. Div.1996) (discussion of witness testimony bias).

III.
Next, Silvaria argues that even if his estranged wife had been qualified to testify as an expert witness, the testimony she gave against him during the forfeiture hearing should have been disregarded as inadmissible net opinion. After reviewing the record, we agree.
Qualified expert testimony is admissible to assist the trier of fact. However, there must be a factual and scientific basis for an expert's opinion. Bahrle v. Exxon Corp., 279 N.J.Super. 5, 30, 652 A.2d 178 (App.Div.1995); Rubanick v. Witco Chemical Corp., 242 N.J.Super. 36, 45, 576 A.2d 4 (App.Div.1990), modified on other grounds, 125 N.J. 421, 593 A.2d 733 (1991). An opinion lacking in foundation is worthless. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305, 108 A.2d 616 (1954). When an expert's opinion is merely a bare conclusion unsupported by factual evidence, i.e., a "net opinion," it is inadmissible. In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989); Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). In essence, the net opinion rule requires an expert witness to give the why and wherefore of his expert opinion, not just a mere conclusion. Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996).
Here, Mrs. Silvaria based her medical diagnosis exclusively on her knowledge of her former husband using the drug Paxil, thus attempting to buttress or bootstrap her opinion by injecting disputed facts. She did not know the extent to which he was using the drug, nor did she have precise knowledge regarding the diagnosis that prompted Silvaria's initial use of the drug. Because Paxil can be given for a variety of mental illnesses, it is self-serving for Mrs. Silvaria to speculate that her former husband was taking the drug for treatment of the most dangerous and violent of the possible forms of depression. Further, she had not lived with her former husband since November 1997, and her contact with him thereafter appears to have been quite limited. She had no occasion to formally examine him and evaluate his condition prior to her March 1998 testimony. Essentially, Mrs. Silvaria could only guess at the nature of the diagnosis. This led to the judge speculating and couching his decision in terms of impermissible possibilities. If a jury as fact-finder is not permitted to speculate, Posta v. Chung-Loy, 306 N.J.Super. 182, 204, 703 A.2d 368 (App.Div.1997), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998), we see no reason why a judge as fact-finder should.

IV.
Although the domestic violence complaint filed against Silvaria was ultimately dismissed for lack of evidence, such a dismissal does not preclude the court from taking firearms away from a person for posing a threat to public health, safety or welfare. See Matter of J.W.D., 149 N.J. 108, 693 A.2d 92 (1997); State v. Volpini, 291 N.J.Super. 401, 413, 677 A.2d 780 (App.Div.1996) (complainant appeared coerced to withdraw her domestic violence complaint); N.J.S.A. 2C:58-3(c). In this regard, the State argues that Mrs. Silvaria's fact testimony of the *150 harassment and fears created by her former husband's actions and phone calls is so overwhelming that we should affirm the forfeiture of the weapons. An examination of this testimony results in a contrary conclusion.
Here, Silvaria is a licensed, contract physical therapist who is a twenty-six year veteran of the Navy. He has no criminal history and no criminal arrests. Although Mrs. Silvaria alleged that her former husband haphazardly placed a pistol between the sofa cushions in their marital residence, there was insufficient evidence to support that claim. It is certainly not supported by the testimony of the arresting police officer who retrieved Silvaria's weapons. Furthermore, the judge did not comment on or make any fact finding on the credibility of this assertion by Mrs. Silvaria.
Here, unlike State v. Volpini, supra, 291 N.J.Super. at 412-414, 677 A.2d 780, there was insufficient credible evidence offered at the forfeiture hearing to demonstrate that Silvaria posed a threat to the public health, safety or welfare. The evidence of harassment and "outbursts" described by Mrs. Silvaria, appears more aptly described as frustration surrounding the marital break-up, rather than psychological behavioral outbursts. Even Mrs. Silvaria conceded that this was a distinctly possible explanation of her estranged husband's behavior. Furthermore, Mrs. Silvaria's testimony was self-serving and cloaked in medical terminology that lacks proper foundation.
Under previous cases of forfeiture of weapons pursuant to N.J.S.A. 2C:58-3, the evidence of threat to the public welfare was generally overwhelming. See State v. Freysinger, 311 N.J.Super. 509, 515-516, 710 A.2d 582 (App.Div.1998) (sufficient proof offered to demonstrate that defendant was habitual drunkard; defendant had two driving under the influence convictions and two convictions for refusing to submit to chemical tests; moreover defendant admitted to committing a hit-and-run against a pedestrian); Hoffman v. Union County Prosecutor, 240 N.J.Super. 206, 572 A.2d 1200 (Law Div.1990) (forfeiture of weapons based on pattern of violent behavior and alcohol abuse). See also State v. Volpini, supra (291 N.J.Super. at 416, 677 A.2d 780) (remand required for a plenary hearing). Here, the testimony adduced at the forfeiture hearing produced nothing that would rise to a level of threat to the public health, safety or welfare such as would warrant forfeiture of Silvaria's weapons.
Reversed.
NOTES
[1] According to the Physicians' Desk Reference, Paxil is prescribed for treatment of depression, obsessive compulsive disorders and panic disorders.
[2] The propriety or legality of such action is not before us. We note that N.J.S.A. 45:11-49b and c requires the participation of a "collaborating physician" or "pursuant to the specific direction of a physician."
[3] N.J.S.A. 45:11-23b provides in part:

The practice of nursing as a registered professional nurse is defined as diagnosing and treating human responses to actual or potential physical and emotional health problems, through such services as case finding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed or otherwise legally authorized physician or dentist. Diagnosing in the context of nursing practice means that identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen. Such diagnostic privilege is distinct from a medical diagnosis. Treating means selection and performance of those therapeutic measures essential to the effective management and execution of the nursing regimen. Human responses means those signs, symptoms, and processes which denote the individual's health need or reaction to an actual or potential health problem. [emphasis added]