**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4845-17T3

RAPHAEL RODRIGUEZ, as
Administrator Ad Prosequendum
of the Estate of HECTOR
RODRIGUEZ, deceased,

 Plaintiff-Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

 Defendant,

and

UNIVERSITY OF MEDICINE AND
DENTISTRY OF NEW JERSEY and
UNIVERSITY BEHAVIORAL
HEALTHCARE-UNIVERSITY
CORRECTIONAL HEALTHCARE,

 Defendants-Respondents.

_____

Submitted October 10, 2019 - Decided December 4, 2019

Before Judges Koblitz and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0568-16.

Franzblau Dratch, PC, attorneys for appellant (Brian Michael Dratch, on the brief).

Drake Law Firm, PC, attorneys for respondents (David Robert Drake, on the brief).

PER CURIAM

Plaintiff Raphael Rodriguez, as the administrator of the estate of Hector Rodriguez, his son, appeals from the May 11 and 16, 2018 Law Division orders, respectively granting summary judgment to defendants University of Medicine and Dentistry of New Jersey and University Behavioral Healthcare - University Correctional Healthcare (UMDNJ-UCH), and New Jersey Department of Corrections (NJDOC), and dismissing his complaint with prejudice. The complaint arose out of the medical care provided to Hector[1] while he was incarcerated at South Woods State Prison "confined to a wheelchair" and "prone to pressure or decubitus ulcers." Hector filed a personal injury complaint alleging negligence on the part of UMDNJ-UCH, the entity contracted by NJDOC to provide medical care to state prisoners. Following Hector's death on August 26, 2015, by consent order, Raphael filed a new complaint adding a

---

[1] We refer to the Rodriguezes by their first names to avoid any confusion caused by their common surname and intend no disrespect.

A-4845-17T3

wrongful death claim, which he later voluntarily dismissed, leaving only the survival action. In granting summary judgment, the trial court found as a matter of law that plaintiff's expert who was a registered nurse was not qualified to render a medical opinion on causation. We reverse and remand for trial on the survival claim.

The facts, when viewed most favorably to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995), reveal that when Hector was incarcerated in 2005, he was a partial quadriplegic as a result of a gunshot wound. He had partial use of his upper extremities and could self-propel a wheelchair. Since October 2007, Hector suffered from stage two scrotal ulceration. When his condition worsened, on May 27, 2008, he was admitted to South Jersey Health Care for treatment. Doctors explained to Hector, who had a history of non-compliance with treatment regimens, that he could not stay in his wheelchair all day, but had to offload the pressure to his wounds by repositioning himself frequently to prevent further skin breakdown.

On July 10, 2008, Hector was transferred to the extended care unit at South Woods State Prison (South Woods) where he received daily wound treatment with topical therapy for his ulcerated scrotal area. The nursing staff also provided Hector with an air mattress and heel protectors and, like the doctors at

South Jersey Health Care, told him to reposition himself every two hours while in bed and every fifteen minutes while in his wheelchair. On July 13, 2008, the nursing staff discovered and treated additional lesions on Hector's sacral and inner thigh area. Hector also developed pressure ulcers on his right and left feet. By October 2008, the ulcers on Hector's sacral area worsened, necessitating surgical debridement. Hector was again instructed to reposition himself frequently, but did not comply.

On November 18, 2008, Hector was admitted to St. Francis Medical Center (St. Francis) to undergo a diverting colostomy. He also underwent debridement of his necrotic sacral pressure ulcer. While at St. Francis, Hector again refused care on numerous occasions. Once he returned to South Woods, nursing staff documented that Hector refused care and repositioning ten times in December 2008. By 2009, Hector continued to refuse care on a regular basis, and his ulcers worsened. Despite staff regularly assessing Hector's skin and attempting to provide treatment, between October 2009 and July 2011, Hector was admitted to St. Francis several times for surgical debridement and other treatment related and unrelated to his ulcers. In 2010 and 2011, Hector's cooperation with his treatment improved.

A-4845-17T3

On September 26, 2011, Hector filed the personal injury complaint that is the subject of this appeal against NJDOC and UMDNJ-UCH for failure to provide him "with adequate medical care" at South Woods. He alleged defendants "breached their duty" to ensure he "[did] not receive pressure or decubitus ulcers," which were "direct[ly] and proximate[ly] cause[d]" by "defendants' carelessness, recklessness, and negligence in failing to properly treat [him.]" To support his claim, Hector filed an affidavit of merit authored by Bonnie Tadrick, a registered nurse certified in wound care, opining that the treatment provided to Hector by the nursing staff at South Woods "fell outside acceptable professional standards and treatment practices." Hector also provided a September 4, 2013 report, and an October 2, 2014 supplemental report prepared by Tadrick, who was deposed on December 11, 2014.

In her report, Tadrick opined that by directing Hector to reposition himself, "[t]he [South Woods nursing] staff . . . neglect[ed] their duty to [Hector] by shifting the responsibility of pressure offloading to him, when he clearly [was] incapable of doing so." She asserted "[Hector] was not non-compliant[,]" as documented by staff but "was simply physically unable to effectively move his body without human assistance." She noted Hector's past medical history included "atrophy of his left hand," and "a weak grip" in his right hand. He "was

A-4845-17T3

completely dependent upon the South Woods . . . staff for all [activities of daily living,] including bathing, hygiene, dressing, transfers, . . . and . . . mobility." He also reportedly suffered from "[b]ipolar [d]isorder." Tadrick concluded that the nursing staff's "failure to develop and implement and provide an ongoing individualized plan of care . . . that met [Hector's] needs for turning and repositioning in bed, pressure redistribution in the wheelchair, and limited seating time was a proximate cause in [Hector] developing severe . . . pressure ulcers."

To counter Tadrick's opinion, UMDNJ-UCH submitted an April 14, 2014 report prepared by Dr. Matthew Dougherty, a vascular surgeon, who was also deposed. In his report, Dougherty opined that Hector's "non-compliance with offloading and his care in general . . . was the major contributor to the development of his decubitus lesions." Contrary to Tadrick's opinion, Dougherty described the nursing staff's care of Hector as "nothing short of exemplary." Dougherty rejected Tadrick's "suggest[ion] that nurses should have forcibly repositioned [Hector] on those occasions when he refused to be helped," explaining that such actions "would [have] amount[ed] to battery, from a legal perspective." Dougherty further noted that "[p]atients with spinal cord injury are particularly susceptible" to decubitus ulcers "not only because they lack the

ability to perceive or respond to excess pressure, but because muscle atrophy and chronic local ischemia from pressure results in a lack of adequate natural tissue padding." He explained "even with the best of care[,]" skin "breakdown eventually occurs, and is extremely difficult to heal."

In her deposition testimony, Tadrick acknowledged that pressure ulcers can occur in the absence of a deviation from the standard of care. She also agreed that paraplegics and quadriplegics "are a[t] greater risk for pressure ulcer development," but disagreed that ulcers would develop "even with the best of care." She testified that while she did not review Hector's past medical records, "[her] opinions were based . . . [on her] review [of] the records from when he was incarcerated at South Woods." She maintained that "the nursing staff did not consistently . . . implement a really comprehensive and aggressive plan of care" and "there was no[] . . . aggressive approach to . . . gaining compliance" when "[Hector] would be[come] resistant to care[.]"

On March 29, 2018, UMDNJ-UCH moved for summary judgment, asserting that a medical diagnosis was required to exclude other causes for the ulcers, and Tadrick was unqualified to provide such a diagnosis. At oral argument, UMDNJ-UCH posited "the crux of the issue" was whether "an actual medical diagnosis [was required] to make the link between liability and

damages." Plaintiff countered that no medical diagnosis was required to establish a prima facie case of medical negligence because Tadrick determined Hector's ulcers were caused by defendants' failure to adequately care for Hector. According to plaintiff, it was up to the jury to decide whether the ulcers were caused by different factors.

On May 11, 2018, in an oral opinion, the judge granted UMDNJ-UCH's motion. The judge agreed with UMDNJ-UCH that it was not enough that Tadrick was "competent to give an opinion that improper positioning of a patient leads to pressure ulcers." The judge explained that because Hector "was a paraplegic" with "a complicated medical history," and Tadrick "conceded . . . there can be various causes of a pressure ulcer in an individual with paraplegia[,]" plaintiff was required "to offer a witness who [was] competent to give medical testimony about the cause of the ulcers in this particular [patient.]" Specifically, according to the judge, "the opinion [on] causation in this case require[d] an expert" who could opine that "based on this patient's medical history[,] . . . the cause of [his] ulcers was either the failure to position or some other cause." The judge queried "if the expert . . . does [not] have the competency to give an opinion that it was not the paraplegia that caused the

injury, how can she be qualified [to opine] that it was the failure to position the patient that was the cause of the injury?"

Upon concluding Tadrick did not have the qualifications to give "a medical opinion . . . to allow the jury to determine the medical cause of [Hector's] injuries[,]" the judge determined plaintiff had no "causation opinion," which was required "to prove . . . medical malpractice," and UMDNJ-UCH was thus entitled to summary judgment "as a matter of law." In light of that decision, the judge granted NJDOC's unopposed application for dismissal with prejudice. The judge entered memorializing orders, and this appeal followed.

On appeal, plaintiff renews his contention that Tadrick "is qualified to opine as to causation regarding [Hector's] decubitus ulcers" and the motion judge erred in ruling otherwise. We agree.

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is

> entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Ibid. (quoting R. 4:46-2(c)).]

See Brill, 142 N.J. at 540. Where, as here, we primarily review the trial court's legal conclusion, we accord no deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts" and apply a de novo standard of review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

To establish a prima facie case of negligence in a medical-malpractice action, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (quoting Gardner v. Pawliw, 150 N.J. 359, 375 (1997)). The traditional burden of proof for establishing proximate cause requires "proof by a preponderance of the evidence that the injury complained of probably would not have occurred 'but for' the negligent conduct of the defendant." Gardner, 150 N.J. at 377. However, when the plaintiff suffers from a preexisting condition, as here, the burden of proof to establish causation is lessened. "[B]ecause the preexistent condition itself serves as a 'but-for' cause of the ultimate injury[,]" ibid., in those cases, a more flexible standard requires a

plaintiff to show that "as a result of a defendant's negligence, [the plaintiff] experienced an increased risk of harm from that condition, and that . . . increased risk of harm was a substantial factor in causing the injury ultimately sustained." Id. at 375.

Turning to the expert testimony at issue here, pertinent to this appeal, N.J.S.A. 45:11-23(b) provides in part:

> The practice of nursing as a registered professional nurse is defined as diagnosing and treating human responses to actual or potential physical and emotional health problems, through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed or otherwise legally authorized physician or dentist. Diagnosing in the context of nursing practice means the identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen within the scope of practice of the registered professional nurse. Such diagnostic privilege is distinct from a medical diagnosis. Treating means selection and performance of those therapeutic measures essential to the effective management and execution of the nursing regimen. Human responses means those signs, symptoms, and processes which denote the individual's health need or reaction to an actual or potential health problem.

Interpreting N.J.S.A. 45:11-23(b), in State v. One Marlin Rifle, 319 N.J. Super. 359 (App. Div. 1999), we held that a wife, who was a certified clinical

nurse specialist and an advanced practice nurse in mental health and psychiatric nursing, was not qualified to render an expert opinion "with respect to a medical diagnosis of her former husband's mental condition." Id. at 368. The former husband opposed the State's weapons forfeiture action following the dismissal of a domestic violence complaint that the wife had filed against him on the ground that he did not "'pose a threat to public health, safety, or welfare' pursuant to N.J.S.A. 2C:58-3(c)(5)." One Marlin Rifle, 319 N.J. Super. at 362. We interpreted N.J.S.A. 45:11-23(b) to permit registered nurses to provide "nursing diagnosis," as opposed to "medical diagnosis." One Marlin Rifle, 319 N.J. Super. at 369. We noted "[a] nursing diagnosis identifies signs and symptoms only to the extent necessary to carry out the nursing regimen rather than making final conclusions about the identity and cause of the underlying disease." Ibid. We concluded that "[g]iven the statute's prohibition against a nurse providing such a diagnosis, the trial court's acceptance of such testimony was inappropriate even aside from issues of the interest and potential bias of the witness." Id. at 369-70.

We do not interpret N.J.S.A. 45:11-23(b) so narrowly as to preclude, in appropriate cases, a nursing opinion on causation, and we conclude that One Marlin Rifle does not mandate a contrary result. The specific deviations Tadrick

addressed in her September 4, 2013 report directly related to the "provision of care supportive to or restorative of life and well-being" and the execution of "medical regimens as prescribed by a licensed or otherwise legally authorized physician . . . ." N.J.S.A. 45:11-23(b). Specifically, Tadrick opined:

> [Hector's] risk of skin breakdown was well recognized by the South Woods nursing staff and they were responsible to develop a plan of care to address his needs and to mitigate risks for pressure ulcer development. . . .
>
> . . . .
>
> In the course of provision of care to [Hector], the licensed professional nursing staff failed to utilize the nursing process as evidenced by a lack of care planning, implementation of appropriate interventions and evaluation of those interventions with revisions to the care plan as needed in regards to pressure ulcer prevention and wound healing.
>
> . . . .
>
> . . . [T]he nursing staff's recognition of [Hector's] risk for skin breakdown and their failure to develop and implement and provide an ongoing individualized plan of care with expected outcomes that met [Hector's] needs . . . was a proximate cause in [Hector] developing severe . . . pressure ulcers. Without developing an implementation pathway or timeline within the plan with an ongoing criterion based evaluation of the outcomes and effectiveness of the planned interventions for [Hector], the standard of care was not upheld by the South Woods nursing staff leaving a completely inconsistent approach to his care.

After developing the severe pressure ulcers, [Hector] had to be hospitalized several times for surgical wound debrid[e]ments, which were painful post operatively. . . . The pressure ulcers were a great source of pain and suffering for [Hector] and became life threatening in 2011 when he was hospitalized for Septicemia.

Tadrick's opinion falls squarely within the diagnostic privilege of the nursing practice contemplated in N.J.S.A. 45:11-23(b), does not require a medical diagnosis, and provides the requisite causation opinion to prove a medical malpractice case. There is no dispute that Hector's care required turning and repositioning to offload the pressure to his wounds and prevent further skin breakdown. Indeed, Hector's day-to-day care in that regard was undertaken and provided by the South Woods' nursing staff, not physicians. Tadrick's opinion addressed the South Woods' nursing staff's failure to select and perform "those therapeutic measures essential to the effective management and execution of the nursing regimen." N.J.S.A. 45:11-23(b). Thus, we are satisfied N.J.S.A. 45:11-23(b) does not prohibit Tadrick's testimony on the issue of causation under the particular facts of this case, and a medical diagnosis is not required.

Because of Hector's preexisting condition, plaintiff's burden to prove causation is lessened. Plaintiff need only show that defendants' negligence increased Hector's risk of harm and was a substantial factor in causing the injury

ultimately sustained, rather than that defendants' negligence was the "but for" cause of Hector's ulcers.  Gardner, 150 N.J. at 375-77.  Moreover, "for purposes of awarding compensatory damages based on the increased risk of future harm caused by the tortious conduct of others, we need not insist on a quantification of the risk of future harm with mathematical exactitude."  Id. at 388 (quoting Scafidi v. Seiler, 119 N.J. 93, 118 (1990) (Handler, J., concurring)).

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4845-17T3