**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5092-18

ESTATE OF ANNETTE JACOBS
by Executrix TAMARA E.
JACOBS and TAMARA E.
JACOBS, Individually,

      Plaintiff-Appellant,

v.

PRINCETON MEDICAL CENTER,

      Defendant-Respondent,

and

LENOX HILL HOSPITAL,
THE ELMS OF CRANBURY,
THE PAVILIONS AT
FORRESTAL, MERWICK
CARE & REHABILITATION
CENTER and MARY MANNING
WALSH HOME,

      Defendants.

_____

Argued October 7, 2020 – Decided October 18, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0914-16.

Sherri L. Warfel argued the cause for appellant (Stark & Stark, PC, attorneys; Sherri L. Warfel, of counsel; Alex J. Fajardo, on the brief).

Beth A. Hardy argued the cause for respondent (Farkas & Donohue, LLC, attorneys; Beth A. Hardy, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Plaintiff Tamara E. Jacobs, executrix of the estate of her mother, Annette Jacobs, appeals from a summary judgment dismissing her nursing malpractice action against defendant Princeton Medical Center. We affirm.

Plaintiff filed this action in 2016 against defendants the Medical Center, Lenox Hill Hospital, The Elms of Cranbury, The Pavilions at Forrestal, Merwick Care and Rehabilitation Center and the Mary Manning Walsh Nursing Horne, alleging her mother developed pressure sores on her sacrum and heels at the Medical Center in 2014 that worsened there and at the other defendant facilities, causing her pain and suffering over the course of the last year of her life and contributing to her death in April 2015 at age ninety.

Plaintiff's mother was initially admitted to the Medical Center in May 2014 for unspecified abdominal pain. She was found to be suffering from

2

diverticulitis, post-herpetic neuralgia following a bout of shingles in 2005, coronary artery disease following placement of a stent in 2009, hyperlipidemia and arthritis. She was released to Pavilions at Forrestal ten days later, but was readmitted to the Medical Center the following day, again suffering from severe abdominal pain and a fever. She remained at the Medical Center for another ten days, during which it is undisputed that she developed a sacral ulcer, measured to be one centimeter by one-half centimeter. Plaintiff's mother was released to Elms for ten days and then was readmitted to the Medical Center suffering from shortness of breath and weakness. She was admitted to the ICU and diagnosed with diverticulitis, failure to thrive and fungemia, a fungal infection of the blood, and observed to be suffering from anasarca, severe and widespread edema with weeping. She was also hypotensive and required vasopressor support. Laboratory studies at that time revealed severe protein malnutrition and anemia. She remained at the Medical Center for almost three weeks, finally being released in late June 2014.

Plaintiff's mother would not be readmitted to the Medical Center for another seven months, but it was not because her condition improved. She was transported from the Medical Center on June 25, 2014, to Lenox Hill Hospital in New York where she remained for two-and-a-half months. There she was

3

definitively diagnosed with Crohn's disease, and surgeons performed a diverting colostomy. Her condition steadily deteriorated and she became more debilitated. In September 2014, she was released to Mary Manning Walsh, where she remained until late October, when she was re-admitted to Lenox Hill for a ten-day stay. Plaintiff's mother returned home at that point, where she remained for nearly three months.

In early February 2015, after seven months at three other facilities and her home, plaintiff's mother returned to the Medical Center for evaluation and treatment of a pressure sore on her right heel. The pressure sore on her sacrum acquired at the Medical Center the year before was then measured to be seven centimeters by four centimeters with undermining of three-and-one-half centimeters. Plaintiff's mother remained at the Medical Center for ten days, when she was released to Merwick. She stayed at Merwick only two days before being re-admitted to the Medical Center due to an acute change in her mental status.

By late February, plaintiff's mother's mental condition was improved and she was discharged to her home. She was re-admitted to the Medical Center in mid-March, however, for hypervolemic shock and diagnosed with renal failure with lactic acidosis and a small bowel obstruction. She was transferred to Lenox

A-5092-18

Hill five days later for treatment of the bowel obstruction and remained there until her death on April 11, 2015.

Although the case began against six defendants, that number was quickly whittled down. Pavilions at Forrestal and Merwick were dismissed in January 2017 for plaintiff's failure to file affidavits of merit. Plaintiff voluntarily dismissed her claims against Lenox Hill and Mary Manning Walsh for lack of jurisdiction and proceeded against those defendants in New York. Thus, by the time plaintiff served her expert reports in 2018, the only defendants in the case were the Medical Center and Elms.

Plaintiff's nursing expert, Barbara Darlington, R.N., opined that nurses at the Medical Center and at Elms deviated from accepted standards of nursing care by failing to plan and implement standard interventions for the prevention and treatment of pressure sores, including failure to plan and implement: routine turning and positioning of plaintiff's mother every two hours while she was in bed; strategies for prevention of shear and friction injuries; strategies to monitor her nutritional intake, such as calorie counts and daily weights; and strategies to prevent moisture related dermatitis such as checking and changing her every two hours when she became incontinent. Nurse Darlington's opinion allowed plaintiff to establish two of the three elements of her prima facie case of

A-5092-18

negligence, the applicable standard of care and deviation from that standard. See Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (instructing that a prima facie case of medical negligence requires expert testimony establishing the standard of care, deviation from that standard, and that the deviation proximately caused the injury).

Because Nurse Darlington is not a doctor, however, she could not offer an opinion on proximate cause. See State v. One Marlin Rifle, 319 N.J. Super. 359, 369-70 (App. Div. 1999) (finding trial court erred in accepting nurse's opinion testimony regarding identity and cause of condition, constituting medical diagnosis prohibited by N.J.S.A. 45:11-23(b), statute regulating practice of nursing); see also Ryan v. Renny, 203 N.J. 37, 50 (2010) (noting determination of whether expert is qualified to provide opinion under N.J.R.E. 702 can be guided by statute). Plaintiff accordingly presented the testimony of Adam H. Karp, M.D., a board certified internist and geriatrician for that purpose. Although Dr. Karp reviewed all of plaintiff's mother's medical records over the last year of her life, he was asked to opine only on the injuries caused or exacerbated by the Medical Center and Elms, the only defendants remaining in the case.

A-5092-18

In the two reports he offered here, Dr. Karp opined that plaintiff's mother developed the pressure ulcers on her sacrum and heels at the Medical Center and that her sacral wound worsened at Elms. He opined the "ulcers were non-healing and remained with her until her death[,] which was in part caused by the development and infection of these ulcers." He also opined that at both the Medical Center and at Elms, plaintiff's mother's "skin breakdown was poorly monitored, allowed to worsen and progress until causing significant infection with undermining, and required extensive treatment for a lengthy period of time," which "caused her pain, suffering and contributed to her death."

At his deposition, however, Dr. Karp testified he was never provided a copy of Nurse Darlington's reports in this case nor her deposition testimony and was not aware of what she claimed were the deviations from the standard of care. He could not, therefore, causally link any specific deviation from the standard of care to any injury the decedent suffered. He testified that pressure ulcers always result from poor care, and that the same is true for an ulcer that worsens, although he admitted that some will fail to heal even with appropriate nursing care.

Dr. Karp was also forced to admit at deposition that plaintiff's mother acquired her heel ulcers at Lenox Hill and Mary Manning Walsh and not at the

7

Medical Center. He also testified that not all pressure ulcers cause pain. And although Dr. Karp testified at deposition that "turning the patient" and "cleaning the wound and taking care of it is very uncomfortable for patients," they "don't like it," and that he has "seen that in many patients," he found no complaints of pain relating to the sacral ulcer in the decedent's chart and no indication that plaintiff's mother ever required medication for pain related to her sacral ulcer. Asked specifically whether he could cite to anything suggesting plaintiff's mother "in particular was uncomfortable or didn't like it or felt any pain," Dr. Karp answered, "No."

Dr. Karp also testified at deposition that when plaintiff's mother was admitted to the Medical Center in February 2015 for treatment of possible infection of the ulcer on her right heel, a vascular surgeon debrided the wound, treated her for a soft tissue infection with IV antibiotics, and that a bone biopsy was negative for osteomyelitis. He confirmed the Medical Center bore no responsibility for the development or worsening of the decedent's heel ulcers, and that her chart noted there was no sign, at that time, that the sacral ulcer was infected. Dr. Karp also testified there was no sign of infection of the sacral ulcer during plaintiff's mother's last admission to the Medical Center the following month when she was in the ICU for renal failure.

8

Dr. Karp testified that on plaintiff's mother's final admission to Lenox Hill where she died, a vascular surgery consult revealed that both her heel and sacral ulcers had "100 percent granulation tissue" and appeared to be healing. He confirmed there was "no evidence the ulcers were infected," that plaintiff's mother had multiple abdominal infections, including peritonitis, attributable to her underlying gastrointestinal condition, and that she died from complications of her Crohn's disease. Although admitting there was no evidence in the record that plaintiff's mother's sacral ulcer contributed to her death, Dr. Karp maintained "she would have been in a better medical state throughout this whole period had she not had a [pressure] ulcer."

After those depositions, plaintiff settled her case against Elms, and the Medical Center moved for summary judgment. The Medical Center asserted Dr. Karp had offered only a net opinion without factual support that nursing care at the Medical Center caused plaintiff's mother pain and suffering and contributed to her death, and thus that plaintiff could not establish proximate cause, scuttling her prima facie case against the Medical Center.

When counsel for the Medical Center pressed those points at argument on the motion, plaintiff's counsel asked that before granting summary judgment

A-5092-18

dismissing the complaint that the court hold a <u>Kemp</u>[1] hearing pursuant to N.J.R.E. 104 to permit Dr. Karp to clarify his opinions. Counsel for the Medical Center objected, arguing a <u>Kemp</u> hearing was not appropriate as the issue was not Dr. Karp's qualifications or methodology under N.J.R.E. 702 but the lack of factual support for his opinion under N.J.R.E. 703. After permitting the parties to brief the issue, Judge Walcott-Henderson determined "out of an abundance of caution" to permit plaintiff to present her expert in a Rule 104 hearing.

At that hearing, Dr. Karp reiterated the testimony he gave at his deposition that in his opinion, all pressure ulcers are due to "poor care." But because he could not offer an opinion on the standard of nursing care and had not read Nurse Darlington's reports or her deposition transcript, he could not "causally relate any specific deviation from the standard of care to any damage in this case." The doctor testified, however, that there was no evidence in the chart that plaintiff's mother was turned or changed every two hours, "which would be the standard of care." Dr. Karp explained that

> [a]s to nursing care, I'm not a nurse. I'm not the one
> who supervises nurses and I've never been to nursing
> school. I don't know how a nurse is supposed to treat

---

[1] <u>Kemp ex rel. Wright v. State</u>, 174 N.J. 412, 427 (2002) (holding a Rule 104 hearing "allows the court to assess whether the expert's opinion is based on scientifically sound reasoning or unsubstantiated personal beliefs couched in scientific terminology").

A-5092-18

this type of patient but I know that the patient developed an ulcer, I see that the patient was not turned every two hours so to me that makes, that's causality.

When plaintiff's counsel referred the doctor to his report noting evidence that plaintiff's mother was turned and repositioned and changed every two hours, Dr. Karp testified there were entries in the chart that she was turned every two hours, "but it didn't say that all the time." The doctor also admitted on cross-examination that plaintiff's mother was not completely bed-bound during her first admissions to the Medical Center in May 2014, that she was out of bed with assistance and receiving physical therapy, and that her chart noted "she could turn herself with encouragement."

Dr. Karp also admitted he had been mistaken to conclude in his report that plaintiff's mother developed heel ulcers at the Medical Center, and thus admitted that any pain attributable to her heel ulcers was not attributable to the Medical Center. Although Dr. Karp testified at deposition that he saw nothing in the decedent's chart to indicate she had ever complained about pain in connection with her sacral ulcer, at the Rule 104 hearing he testified "she definitely had pain" and noted an entry from her May 2014 chart at the Medical Center that she complained of buttock pain, notwithstanding she had no skin breakdown at that time. On cross-examination, however, he was forced to admit that every time

11

A-5092-18

plaintiff's mother complained about pain in her buttocks in the chart, she was complaining about hemorrhoidal pain and requesting suppositories to relieve that pain. Dr. Karp admitted he could recall "no documented complaint of any pain related to a sacral ulcer."

As to any contribution of the sacral ulcer to plaintiff's mother's death in May 2015, Dr. Karp testified "she basically died of overwhelming sepsis and the notes say they weren't sure what type of infection it was," whether a gastrointestinal infection, a stomach infection "or cluster of difficile infection which is one of the superbug type infections that unfortunately occurs when you give patients antibiotics for long periods of time," or whether there was "a bone infection either in the sacral ulcer we're talking about" or a healed ulcer that doctors tried unsuccessfully to isolate bacteria from, leaving "a possibility of an osteomyelitis." He testified "[i]f you have an overwhelming infection, that can cause death and that can certainly come from a [pressure] ulcer."

On cross-examination, however, Dr. Karp acknowledged there was no sign of any infection in the sacral ulcer in plaintiff's mother's admissions to the Medical Center in February and March 2015, that the sacral ulcer "had essentially stayed the same" at that time, and that a vascular surgery consult at Lenox Hill before her death in mid-April 2015 revealed "100 percent granulation

12

tissue" in both the heel and sacral ulcers with the surgeon opining that both were healing. Dr. Karp conceded there was no diagnosis of infection in the sacral or heel ulcers at Lenox Hill, no evidence any of the ulcers was infected, and that plaintiff's mother died on April 11, 2015 from complications of her Crohn's disease, "completely unrelated to the sacral ulcer . . . [a]ccording to the treating doctors." Dr. Karp testified he could "absolutely" not say "to a reasonable degree of medical probability that the sacral ulcer caused [plaintiff's mother's] death."

After hearing that testimony, Judge Walcott-Henderson granted summary judgment to the Medical Center. The judge began her oral opinion by reviewing the standard for deciding a motion for summary judgment and the requirements of a plaintiff's prima facie case of negligence in a nursing malpractice action. Acknowledging the Medical Center conceded for purposes of the motion that plaintiff presented expert testimony through Nurse Darlington establishing both the standard of nursing care and a deviation from that standard, the judge focused on whether Dr. Karp's testimony was sufficient to establish the deviation proximately caused plaintiff's mother's pain and suffering or death.

The judge concluded Dr. Karp's opinion amounted to an inadmissible net opinion lacking factual support in the record and could not "form the basis for

13

an essential element of plaintiff's case."  The judge found Dr. Karp's opinion

"could not have been based upon Nurse Darlington's . . . analysis as he did not

have the benefit of her reports prior to rendering his own opinions," and his

testimony at the Rule 104 hearing did not sufficiently establish any causal link

between any "deviation from any applicable standard of care to [plaintiff's

mother's] pain or even her passing."

Specifically, the judge found

> Dr. Karp admitted that the heel ulcer did not develop at
> Princeton.  He admitted that not all ulcers are painful.
> He admitted that [plaintiff's mother] did not complain
> of pain related to the sacral ulcer, that there was no
> documentation of pain medication administered in the
> charts related to the sacral ulcer, that there was no
> complaint of pain in the buttocks area from the sacral
> ulcer.  When [plaintiff's mother] was last admitted to
> Princeton, there was no sign of infection in any of the
> ulcers, that there was no diagnosis of any infection in
> any of the ulcers, that no treating doctor recommended
> any treatment for any infection in any of the ulcers, that
> he had no idea what [Nurse Darlington] alleged to be a
> deviation from the standard of care, that he had no
> opinion on what alleged poor care consisted of or was
> given, and he could not say to a reasonable degree of
> medical certainty that the sacral ulcer contributed to
> [plaintiff's mother's] death.

Based on the doctor's testimony, Judge Walcott-Henderson found he offered

nothing more than a net opinion insufficient to establish that any of the

A-5092-18

deviations from the standard of care identified by Nurse Darlington proximately caused plaintiff's mother any pain or suffering or contributed to her death.

Plaintiff moved for reconsideration, arguing the judge inappropriately weighed the evidence and assumed the role of the jury in evaluating Dr. Karp's credibility at the N.J.R.E. 104 hearing instead of simply considering whether his testimony on direct examination, viewed in the light most favorable to plaintiff, was sufficient to establish the causation element of her prima facie case. Plaintiff also argued, based on an unpublished opinion of this court, that her nursing expert could render an opinion that the nurses' deviation from the standard of care caused the decedent's pressure sores.

The judge denied the reconsideration motion. She explained, again, that there was no issue as to Dr. Karp's qualifications to offer an opinion on proximate cause, and that she barred his testimony only because he failed to "link any alleged deviation from the standard of care to the decedent's death or pain and suffering." Summary judgment was thus appropriate because plaintiff could not without that testimony establish the proximate cause element of her prima facie case.

The judge rejected the argument that she assumed the role of the jury in weighing the evidence, noting the court on summary judgment is required to

15

decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp., Inc. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)). The judge again explained that the problem with Dr. Karp's opinion that the decedent's sacral ulcer caused her pain and suffering and contributed to her death is that it was based on his general perception that pressure ulcers and their treatment are painful and could contribute to a patient's death and not on specific facts in this record that the decedent's sacral ulcer caused her pain or contributed to her demise. As the judge explained, Dr. Karp conceded key facts and thus "failed to connect the dots, effectively rendering a net opinion on the critical issue of causation."

The judge rejected plaintiff's belated attempt to offer her nursing expert on the issue of proximate cause, noting plaintiff conceded on the motion for summary judgment that she was not relying on her nurse expert to establish the element of proximate cause and was thus barred from attempting to do so on reconsideration. The judge also rejected plaintiff's reliance on an unpublished case of this court holding N.J.S.A. 45:11-23(b) does not preclude a nurse from

16

offering an opinion on causation in light of our opinion in <u>One Marlin Rifle</u> holding to the contrary.[2]

Plaintiff appeals, reprising the arguments she made to the trial court both on summary judgment and on reconsideration. Having reviewed the entire record, including the testimony of plaintiff's medical expert at deposition and at the Rule 104 hearing, we conclude none of her arguments is of sufficient merit to warrant any extended discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

As our Supreme Court explained over a decade ago, a trial court confronted with an evidentiary issue on a summary judgment motion must "[a]s a practical matter, . . . address the evidence decision first." <u>Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.</u>, 202 N.J. 369, 384-85 (2010). We review that decision, here the admissibility of Dr. Karp's opinion, only for abuse of discretion. <u>Ibid.</u>

As Judge Walcott-Henderson explained, the admissibility of Dr. Karp's opinion is governed by N.J.R.E. 703, which "mandates that expert opinion be grounded in 'facts or data derived from (1) the expert's personal observations, or

---

[2] We agree the trial court was correct to reject plaintiff's invitation to rely on an unpublished case plainly at odds with controlling precedent. <u>See</u> <u>R.</u> 1:36-3; <u>Trinity Cemetery Ass'n v. Twp. of Wall</u>, 170 N.J. 39, 48 (2001) (Verniero, J., concurring) (noting an unreported decision "serve[s] no precedential value, and cannot reliably be considered part of our common law").

(2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'"  Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).  The corollary of N.J.R.E. 703 "is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006).

Plaintiff conceded on the summary judgment motion and acknowledges in her brief on appeal that only a nurse may opine on the standard of care in a nursing malpractice action, Hill Intern., Inc. v. Atl. City Bd. of Educ., 438 N.J. Super. 562, 586 (App. Div. 2014), but the making of a medical diagnosis is beyond the authority a nurse is accorded by the statute defining the practice of registered nursing, N.J.S.A. 45:11-23(b) ("Diagnosing in the context of nursing practice means the identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen within the scope of practice of the registered professional nurse.  Such diagnostic privilege is distinct from a medical diagnosis."); One Marlin Rifle, 319 N.J. Super. at 369-70 (finding trial court erred in accepting nurse's opinion testimony regarding specific identity and

cause of condition "clearly . . . constitut[ing] a medical diagnosis," prohibited by N.J.S.A. 45:11-23(b)).  See also Ryan, 203 N.J. at 50 (2010) (noting trial court's discretion in determining whether an expert is qualified to testify as an expert under N.J.R.E. 702 is appropriately guided by statute).  As plaintiff's counsel explained to the trial court, that was why she presented Nurse Darlington on the issue of standard of care and deviation and offered Dr. Karp on the issue of proximate cause.

Because Dr. Karp was not provided with a copy of Nurse Darlington's reports or her deposition transcript, however, he did not know what she defined as the standard of care or how she claimed the nurses at the Medical Center deviated from that standard and thus could not link any specific deviation to the decedent's injury or death.  Even were we to accept for sake of argument that Dr. Karp's opinion that pressure ulcers were always caused by poor care somehow established that link, there remains no factual support in the record for his opinion that the decedent's sacral ulcer caused her pain or contributed to her death from complications of Crohn's disease.  Without evidence in the record that the decedent's sacral ulcer caused her pain or contributed in some manner to her death, Dr. Karp's opinion speculating otherwise was properly stricken as an inadmissible net opinion.  See Stanley Co. of Am. v. Hercules Powder Co.,

16 N.J. 295, 305 (1954) (instructing that "[e]xpert opinion is valueless unless it is rested upon the facts which are admitted or are proved").

Because "[a] party's burden of proof on an element of a claim may not be satisfied by an expert opinion that is unsupported by the factual record or by an expert's speculation that contradicts that record," summary judgment dismissing the complaint was appropriately entered. Townsend, 221 N.J. at 55.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5092-18